PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

   *Plaintiff-Appellee,*

v.

PATRICK ALBERT BYERS, JR.,

   *Defendant-Appellant.*

No. 09-4439

UNITED STATES OF AMERICA,

   *Plaintiff-Appellee,*

v.

FRANK KEITH GOODMAN,

   *Defendant-Appellant.*

No. 09-4677

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Richard D. Bennett, District Judge.
(1:08-cr-00056-RDB-1; 1:08-cr-00056-RDB-2)

Argued: January 28, 2011

Decided: May 6, 2011

Before TRAXLER, Chief Judge, and
MOTZ and KEENAN, Circuit Judges.

---

Affirmed by published opinion. Chief Judge Traxler wrote the
opinion, in which Judge Motz and Judge Keenan joined.

**COUNSEL**

**ARGUED:** Marc Gregory Hall, HALL & CHO, PC, Rockville, Maryland; Mary Elizabeth Davis, DAVIS & DAVIS, Washington, D.C., for Appellants. John Francis Purcell, Jr., OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United States Attorney, Baltimore, Maryland, for Appellee.

---

**OPINION**

TRAXLER, Chief Judge:

Patrick Albert Byers, Jr., and Frank Keith Goodman were convicted on charges stemming from a 2007 conspiracy and murder of a witness to prevent him from testifying against Byers in an upcoming state murder trial. Byers and Goodman appeal, challenging several evidentiary rulings by the district court. Goodman also appeals the denial of his motion to suppress. For the reasons that follow, we affirm.

I.

A.

The government presented strong evidence tying Byers and Goodman to the killing of Carl Lackl and offered a motive for the killing: Lackl was the prosecution's primary witness in the upcoming murder trial of Byers for the March 2006 murder of Larry Haynes, and Lackl was expected to be the only witness to place Byers at the scene of that murder. Byers attempted to refute the purported motive by attacking the strength of the state's case against him for the 2006 Haynes murder and the reliability of Lackl as an eyewitness. Thus, the identity of Byers as the person at the scene of the Haynes

murder became a critical part of the Lackl case. In response to Byers's strategy, the government sought to bolster Lackl's credibility and value as a witness by introducing evidence to prove identity, and hence motive, that Byers had previously shot another person in a drug dispute in the same block on North Montford Street where Haynes was killed.

B.

The evidence at trial showed the following chronology. On May 24, 2004, Carlile Coleman was staying at a house located at 506 North Montford Street in Baltimore. The homeowner gave Coleman permission to set up a temporary car wash stand in front of the house. Business was brisk, and Coleman enlisted the help of two assistants. At some point, a person named "Pierre," who Coleman believed was a drug dealer, confronted Coleman and accused him or one of his assistants of taking drugs out of Pierre's car, presumably when they were washing it. Pierre demanded payment for the drugs, but Coleman denied having taken the drugs. A scuffle ensued, and Pierre broke a broom across Coleman's back. Coleman, however, did not give Pierre any money for the purportedly missing drugs.

Following the altercation, Pierre left and Coleman went inside the house. Pierre, however, returned with Byers, who was concealing a gun under his shirt, and they forced their way into the house. Coleman attempted to flee, but Byers shot him in the buttocks. Coleman testified that Byers stood over him as he lay on the floor and said, "I'm going to kill you." J.A. 1076. Byers then pressed the gun against Coleman's stomach, shot him and left. Coleman sustained substantial injuries that required an extended hospital stay. When he had recovered enough to talk to the police, investigators came to the hospital and presented a photo array to Coleman. Coleman identified Byers as his assailant.

About two years later, Byers was implicated in another shooting in the North Montford Street area. On March 4,

2006, Larry Haynes was shot and killed within a block of where Coleman was shot. Around 3:30 p.m., Baltimore Police Detective Thomas Martin was sent to the scene and recovered .40 caliber shell casings and a .40 caliber bullet nearby. Also during the investigation of the murder scene, police recovered a .40 caliber semiautomatic handgun in an adjacent alley on the 500 block of North Montford Street.

While he was still at the scene, Detective Martin was informed that Carl Lackl had contacted police and claimed to have witnessed the shooting. Detective Martin interviewed Lackl later that afternoon. Lackl explained that he and Connie Mays were driving along North Montford Street and stopped on the 500 block for Lackl to urinate. He stepped into an alley. Lackl then heard several gunshots, stepped out of the alley and observed a man he did not know running in Lackl's direction along North Montford Street. Lackl saw the man throw a gun onto the roof of a garage right next to an alley across the street from the alley Lackl was in. This gun was later recovered by law enforcement.[1] The man continued running in a northbound direction and made eye contact with Lackl as he passed him. Lackl then saw Haynes, who had been shot eight times, lying on the ground about one-half block away. Lackl approached Haynes to see if he could help but left him there at the insistence of Mays.[2] When Lackl returned home, he recounted what he had witnessed to his girlfriend Malinda Humes and told her he wanted to call the police and report the shooting. Although Humes, fearing potential retribution from the suspect, advised him not to "get involved," Lackl contacted police headquarters and met with Detective Martin. According to Detective Martin, Lackl's

---

[1]Because police found the gun lying on the ground in the alley rather than on the roof of the garage, Detective Martin surmised that the gun simply "bounced off and landed in the alley." J.A. 993.

[2]Mays testified that she and Lackl drove to North Montford Street to purchase crack cocaine. Mays wanted to leave the scene of the shooting to avoid getting caught with the drugs she had just bought.

description of where the suspect discarded the firearm "precisely" matched the actual location where police had recovered the firearm earlier.

Fortuitously, Baltimore City Police that same day arrested Joseph Parham on unrelated drug possession charges. According to Detective Martin, Parham volunteered information about the Haynes murder, explaining that he also had been on North Montford Street earlier that day and had observed a person he knew only as "Pat" arguing with Haynes. Parham was standing close by when he heard gunshots and then saw Pat shoot Haynes. Parham, who lived on North Montford Street, knew both Pat and Haynes from his neighborhood and knew Haynes dealt drugs in that area. Moreover, Parham told Detective Martin that this was not the first North Montford Street shooting in which Pat had been involved. Parham did not know Pat's full name, but he knew that Pat previously had "shot a car wash guy in the 500 block of Montford" about "a half block from where . . . Haynes was murdered." J.A. 950. Detective Martin then consulted police records to find out who "Pat" was and found the file on the 2004 shooting of Coleman on the 500 block of North Montford Street. Detective Martin learned that, as Parham had suggested, a suspect named "Pat"—Patrick Byers—had been arrested for shooting Coleman. Police records contained a photograph of Byers, which Detective Martin then used in compiling a photo array of "suspects" in the Haynes shooting, containing photographs of Byers and six other individuals. Parham identified Byers from this array as the person who shot Haynes.

Having obtained Byers's name and photograph from the Coleman file, Detective Martin took a similar photo array to Lackl's home. Lackl identified Byers as the man he saw running from the area where Haynes was shot. According to Detective Martin, Lackl's identification "seemed very certain." J.A. 1006. Lackl then wrote, "I Carl Lackl believe that . . . the person I picked out is the person that threw the gun

onto the roof of the garage," and signed his name. J.A. 1007 (internal quotation marks omitted).

Based on the identifications by Parham and Lackl, Detective Martin arrested Pat Byers for shooting Haynes and charged him with first degree murder. Byers admitted that he and his associates were involved in the sale of heroin in the North Montford Street area. Byers further admitted having been in the North Montford Street area around the time of the shooting to check on his drug sales for the day. Byers also conceded that he knew Haynes and that he believed Haynes had recently shot and killed Byers's cousins. Nevertheless, Byers claimed that there were no problems between him and Haynes. Detective Martin did not reveal that police had already recovered the gun, but Byers volunteered that he had hidden a gun near a garage on North Montford Street and that he had intended to turn it over to an "Officer Kevin" in exchange for having drug charges against him dropped.

As Byers's trial for the Haynes murder approached, Parham began to express reluctance to testify. In April 2007, with trial scheduled for July 10, 2007, Parham recanted his identification of Byers and claimed that he fabricated the entire story. Thus, Lackl became the sole eyewitness in the Haynes murder case.

On July 2, 2007, with trial scheduled to begin in one week, Lackl was shot to death in front of his home on Philadelphia Road. Lackl had been trying to sell his used Cadillac and had received a call that evening from someone claiming to be interested in buying the car. The caller indicated he was in the area, so Lackl went outside and waited with his young daughters in front of his house. When a car subsequently stopped in front of his house, Lackl approached. Before he reached the car, however, an occupant sitting in the front passenger seat shot Lackl three times and killed him.

Baltimore County police officers were dispatched to Lackl's home to investigate the shooting and learned that

Lackl had been expected to testify the following week in a state murder trial at which Byers would be facing a first degree murder charge. Byers was in state custody when Lackl was killed.

Investigating officers traced phone calls coming into Lackl's residence on the day of the murder (including calls just minutes before the murder) to a cell phone owned by Marcus Pearson. Ultimately, Pearson cooperated and admitted his role in Lackl's murder. According to Pearson, in June 2007, Goodman offered Pearson $2500 to kill Lackl for Byers, explaining that Byers was facing trial on murder charges and needed to eliminate Lackl as a witness. Pearson agreed to "take care of it" and called Byers, who had a contraband cell phone with him in jail, to verify the $2500 offer for Lackl's murder. J.A. 733; 736-37. The government introduced evidence seized from Byers's jail cell shortly after the murder, including documents containing Lackl's home address. Pearson testified that Goodman gave him this same address as well as Lackl's phone number. Goodman also informed Pearson that Lackl was selling a used Cadillac, information Pearson used to lure Lackl out of his house.

Rather than commit the murder himself, Pearson, a member of the "Bloods" street gang, recruited Jonathan Cornish, a young gang member known as a "baby gangsta," to do the actual shooting. As a "baby gangsta," Cornish was obligated to perform the murder for free.

On the day of the murder, Pearson supplied Cornish with a handgun and directed Cornish and Michael Randle, also a member of the Bloods, to follow Pearson and Tammy Graham, Pearson's girlfriend, to Lackl's house. Graham knew nothing about the murder-for-hire scheme; Pearson simply told her to drive down Philadelphia Road so that he could look at a car that was for sale. On the way, Pearson intended to use a "burner" phone that he had acquired solely for the purpose of making an untraceable call to Lackl before the

murder. Pearson told Lackl on the phone that he was interested in the Cadillac, that he was nearby, and that Lackl should wait for him outside. As they drove by Lackl's house without stopping, Pearson and Graham saw Lackl standing by his car in the front yard. Cornish and Randall also passed by initially but then returned. As Cornish and Randall came to a stop, Lackl approached the front passenger window where Cornish was sitting. Cornish shot Lackl twice while he was standing and a third time after he fell to the ground. Moments after killing Lackl, Cornish called Pearson and reported that he had finished the job. In turn, Pearson immediately called Byers and reported that Lackl was dead; Byers then indicated that other prisoners wanted to have witnesses eliminated as well. Pearson disposed of the burner phone on the way home; however, he had mistakenly used his personal cell phone to make the call to Lackl, and that phone call eventually led police to him.

Within 15 minutes of the shooting, Pearson called Goodman's cell phone to set up a time and place for him to collect payment for killing Lackl. Graham drove Pearson to meet Goodman on the way home, although she was unaware of the purpose of the meeting. Pearson met with Goodman in Goodman's black Thunderbird, and Goodman paid $2200, $300 less than promised. Pearson paid Cornish and Randle $100 each and later took Graham for a night at the Baltimore Inner Harbor Marriott hotel. Graham also testified at trial, corroborating much of Pearson's story. Specifically, she testified that on the day of the murder, Graham agreed to drive Pearson to Philadelphia Road to look at a car for sale. She confirmed that Cornish and another individual followed her and Pearson to Philadelphia Road; that Pearson made a phone call in transit asking for Lackl to come outside; that she did not stop and the car following them made a U-turn back to Lackl's house; and that they stopped shortly after driving down Philadelphia Road and Pearson got into Goodman's car.

Cornish also cooperated with the government and testified at trial, confirming basic details about the murder presented through Pearson's testimony. Cornish further admitted that he was the triggerman who shot Lackl.[3]

The government introduced numerous summaries of calling records obtained by investigators for cell phones recovered from Pearson, Goodman, and Cornish, and for the phone number linked to Byers's contraband cell phone. Although Byers's phone was not recovered, Pearson identified its number, and records established frequent calls from that number to members of Byers's family and to Byers's girlfriends. Phone records reflected calls between all of these phones on the day of the murder. The heaviest contact occurred between the Goodman and Byers cell phones, which made 12 "direct connect" contacts on the day of the murder; the evidence also established numerous contacts in the month before the murder. Likewise, phone records showed several July 2 calls between Pearson's phone and Byers's phone, as well as calls between Pearson and Goodman mere moments before and after Lackl was shot.

Goodman was arrested on September 5, 2007, and officers recovered the cell phone that he had used to communicate with Byers before and after the murder. Goodman was questioned at Baltimore County Police headquarters for more than 6 hours about his involvement in the Lackl murder, but Goodman maintained his innocence.

Byers and Goodman were charged with multiple counts stemming from Lackl's murder, including conspiracy to use interstate communication facilities in the commission of a murder for hire, *see* 18 U.S.C. § 1958(a), and conspiracy to murder a witness resulting in death, *see* 18 U.S.C.

---

[3]Cornish, only 15 at the time of the murder, entered a plea agreement under which state murder charges were dismissed. Cornish received a 40-year sentence.

§ 1512(a)(1)(C). Byers alone was also charged with two counts stemming from the 2006 shooting of Haynes: possessing a firearm as a felon, and possessing a firearm in furtherance of a drug trafficking crime. The case proceeded to trial.

As noted previously, the government presented evidence that Byers arranged for Lackl's murder because of Lackl's expected trial testimony identifying Byers as the individual Lackl saw running with a gun from the scene of the murder of Haynes. Byers countered the government's motive evidence by eliciting testimony that undermined the strength and reliability of Lackl's photographic identification. The defendants highlighted Lackl's habitual drug use during the time that he witnessed the shooting of Haynes; established through cross-examination of Detective Martin that DNA linked to Quinten Hogan, a gang member who lived near the location of the Haynes murder, was found inside the gun that Lackl saw Byers discard; and questioned Detective Martin about the failure of investigators to submit a photographic lineup to witnesses who were in a store on the corner where Haynes was shot.

In response, the government moved to introduce under Federal Rule of Evidence 404(b) evidence about the 2004 shooting of Carlile Coleman on North Montford Street within a block of where Haynes was killed. Over the objections of defense counsel, the district court permitted the government to present evidence that Coleman survived the shooting and later identified Byers from a photographic lineup as the person who shot him over the drug dispute. The government also presented evidence suggesting that Byers was an established drug dealer in the North Montford Street/Jefferson Street area and that Byers shot Coleman and killed Haynes—himself a drug dealer—to protect Byers's "turf."

Baltimore City Police Detective Wayne Jenkins testified that he was assigned to the narcotics unit in 2006 and worked the North Montford/Jefferson Street area on a daily basis.

Detective Jenkins knew Byers as an informant and daily saw Byers near the garage on North Montford Street where Lackl indicated the handgun had been thrown after the Haynes murder. Moreover, Detective Jenkins noted that there was significant drug traffic at the corner of North Montford and Jefferson where Haynes was killed, and, based on his training, information gleaned from numerous prior narcotics investigations in that area, and personal observation, Jenkins believed "that was [Byers's] intersection, that was his corner . . . [h]is street shop." Trial Transcript, Nov. 16, 2009, at 116. Although Detective Jenkins had never personally witnessed Byers making a sale, he saw Byers routinely standing at his corner conversing with drug dealers "all day long." *Id.* at 118.

Finally, Detective Jenkins testified that drug dealers routinely engaged in territorial disputes and fought over street corners that served as distribution points. Detective Jenkins concluded that Byers was giving him information in an attempt to eliminate the competition from rival dealers—Byers supplied Detective Jenkins with tips about drugs being sold in the general area but never gave him information about drug sales at the corner of North Montford and Jefferson.

Byers and Goodman were convicted on seven of the nine charges against them in the indictment, including a conviction of Byers for violation of the felon-in-possession law during the 2006 Haynes shooting.[4] Byers and Goodman both received life sentences. On appeal, Byers and Goodman challenge several evidentiary rulings by the district court. We address each of their contentions below.

---

[4]The jury, however, acquitted Byers on the charge that he possessed a firearm in furtherance of a drug trafficking crime during the 2006 Haynes shooting. This verdict is obviously not determinative of the evidentiary issues.

## II.

Byers argues that the district court abused its discretion in admitting testimony under Rule 404(b) that in 2004 Byers shot Carlile Coleman on the same North Montford Street block where Haynes was killed. We disagree.

Rule 404(b) prohibits evidence of "'other crimes, wrongs, or acts'" solely to prove a defendant's bad character, but "[s]uch evidence . . . may 'be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" *United States v. Basham*, 561 F.3d 302, 326 (4th Cir. 2009) (quoting Fed. R. Evid. 404(b)). Rule 404(b) is a rule of inclusion, "admitting all evidence of other crimes or acts except that which tends to prove only criminal disposition." *United States v. Young*, 248 F.3d 260, 271-72 (4th Cir. 2001) (internal quotation marks omitted).

For prior bad acts to be admissible under Rule 404(b), the proffered evidence (1) "must be . . . relevant to an issue other than character," such as identity or motive, *United States v. Siegel*, 536 F.3d 306, 317-18 (4th Cir. 2008) (internal quotation marks omitted); (ii) "must be necessary to prove an element of the crime charged," *United States v. Queen*, 132 F.3d 991, 995 (4th Cir. 1997), or to prove context, *see id.* at 998; and (iii) "must be reliable." *Id.* at 995. In addition, "the probative value of the evidence must not be substantially outweighed by its prejudicial effect," which "involves a Rule 403 determination," *United States v. Lighty*, 616 F.3d 321, 352 (4th Cir. 2010). We review the district court's decision to admit evidence under Rule 404(b) for abuse of discretion. *See Basham*, 561 F.3d at 325. And, we will not find a district court "to have abused its discretion unless its decision to admit evidence under Rule 404(b) was arbitrary and irrational." *United States v. Weaver*, 282 F.2d 302, 313 (4th Cir. 2003).[5]

---

[5]Though we review the admissibility of the Coleman evidence under Rule 404(b), we are cognizant of its relevance to explain how Pat Byers came to be identified by the police and ultimately by Lackl.

The district court concluded that the 2004 Coleman shooting was important to several critical issues at trial, particularly Byers's identity at the Haynes murder scene. The court noted that Byers's defense to the Lackl murder charges was largely focused on eroding Byers's purported motive to shoot Lackl by showing that "Lackl had mistakenly identified him as the person fleeing from the [Haynes] murder scene in possession of a firearm" and posed little threat to Byers as a witness. J.A. 360. The district court reasoned the Coleman evidence was relevant to establish identity in light of the similarities between the Coleman shooting and the Haynes murder:

> There are significant similarities between the Coleman shooting and the Haynes murder, and such similarities are especially significant to the relevance inquiry under Rule 404(b). In both situations, Byers asserted control over his drug turf through the close range use of a semi-automatic handgun in broad daylight. Moreover, both incidents are closely linked by their geographical proximity. The Coleman shooting occurred at 506 N. Montford Ave., which is less than a block away from where Haynes was shot and directly across the street from the alley where Lackl saw Byers discard his gun.

> These similarities reinforce the relevance of the Coleman shooting to the government's claim that Byers possessed a firearm while fleeing from the scene of the Haynes murder on March 4, 2006. In addition, the Coleman shooting is probative of whether Byers was at the scene of the Haynes murder and whether he was correctly identified by Lackl—an issue that Byers intends to challenge. Evidence that Byers committed the Coleman shooting in assertion of his drug turf makes it more probable that he was correctly identified as asserting control over the same location during the Haynes murder. . . .

J.A. 360-61 (citations omitted).

The district court also found that the Coleman evidence was "necessary" within the meaning of Rule 404(b) to counter Byers's strategy of negating motive by attacking Lackl's identification. The court explained that

> [t]he challenged evidence does not address collateral issues, but instead supports the government's theory that Byers was an established drug dealer in the vicinity of 506 [North] Montford Avenue and that he used firearms to control his domain. More specifically, . . . the evidence is necessary to reinforce the government's claim . . . that Byers was correctly identified as discarding a gun near the scene of the Haynes murder.

J.A. 362 (citation omitted).

### A.

#### 1. Relevance under Rule 404(b)

The question of whether Byers had a motive to kill Lackl was intertwined at trial with the question of whether Lackl was accurate in his identification of Byers in the Haynes murder. Byers takes umbrage with the district court's conclusion that the Coleman evidence was relevant to whether Lackl correctly identified Byers as the fleeing suspect in the Haynes murder. Byers argues that, except for geographical proximity, the Coleman shooting and the Haynes murder are dissimilar. Byers points out that the two incidents lacked temporal proximity, and he contends that the evidence reflected very different motives in each case. According to Byers, the alleged motive for the murder of Haynes would have been revenge since there was evidence that Haynes had shot and killed two of his cousins. By contrast, the alleged motive for the Coleman shooting was drug-related, *i.e.*, Byers was protecting his

business in the North Montford Street area. Thus, Byers argues, the connection between the Coleman shooting and the Haynes murder was too attenuated to be probative as to whether Lackl's identification was mistaken, which, in turn, had bearing upon Byers's alleged motive to kill Lackl. We disagree.

First, the evidence presented at trial was sufficient to permit the jury to reasonably conclude that Byers shot Haynes to retain dominion over his drug turf. Detective Jenkins testified that Byers sold heroin in the North Montford and Jefferson Avenue area and that he was sufficiently engaged in the drug trade to have established his own "street shop" at the corner of North Montford and Jefferson Streets around the time Haynes was murdered there. Detective Martin testified that Byers admitted to him that on the day of the Haynes shooting, he had been on North Montford Street checking on his drug sales and he also volunteered that he had hidden a firearm in the area. And, there was testimony from Parham, a neighborhood resident, that Haynes was himself a drug dealer. Thus, both direct and circumstantial evidence supported the theory that Byers shot Coleman *and* Haynes because of conflicts over drugs within a half-block of each other and on a section of North Montford Street considered to be Byers's street shop. On this evidence, the jury could have easily rejected Byers's alleged motive of wanting to avenge the murder of his cousins and believed that Byers shot Haynes, like Coleman, to protect his position as a drug dealer on that block.

Because the evidence plausibly suggested a common theme to the shooting of Coleman and the murder of Haynes, we conclude that the Coleman shooting was relevant to the charges against Byers for the murder of Lackl. Clearly, Byers premised his defense on showing that the prosecution's case against him for murdering Haynes was so weak that he had nothing to fear from Lackl's identification and therefore did not have a strong motive to prevent Lackl from testifying. In light of Byers's defense, his motive for killing Lackl was con-

nected to the strength of Lackl's identification of Byers in the Haynes murder. The introduction of the Coleman evidence makes it much less likely that Lackl was simply mistaken when he picked Byers out of the lineup. In both incidents, the evidence tied Byers to the general area on North Montford Street where Haynes was shot and suggested Byers was there not by coincidence, but to oversee drug sales in that vicinity. The Coleman evidence strengthened Byers's connection to the place where Haynes was shot, and made Lackl's identification of Byers as the killer of Haynes much more certain. *See United States v. Sanchez*, 118 F.3d 192, 196 (4th Cir. 1997) (noting that prior bad acts occurring in the same "geographic area" as the charged act is a factor that increases the relevance Rule 404(b) evidence).

Second, Byers's argument on appeal gives short shrift to the district court's conclusion that the Coleman shooting was relevant "to the government's claim that Byers possessed a firearm while fleeing the scene of the Haynes murder on March 4, 2006." J.A 360. Unlike other counts in the superseding indictment, counts eight and nine did not arise from the scheme to murder Lackl. Rather, counts eight and nine charged Byers with the commission of two firearms offenses on March 4, 2006, the date of the Haynes murder: illegal possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (count 8), and possession of a firearm in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(a)(1) (count 9).

The Coleman evidence was clearly relevant to counts eight and nine. Indeed, evidence, to be relevant, "need only to have any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *United States v. Aramony*, 88 F.3d 1369, 1377 (4th Cir. 1996) (internal quotation marks omitted). The evidence recounted previously reasonably suggested that Byers was illegally in possession of a firearm on March 4, 2006, *see* 18 U.S.C.

§ 922(g), and that he was engaged to some extent in drug traf-
ficking activities that same day as well, *see* 18 U.S.C.
§ 924(c)(1)(a)(1). Coleman's testimony underscored the gov-
ernment's theme that Byers was a drug dealer who used a gun
to exert control over the spot where Haynes was shot and the
nearby surrounding area. *See United States v. Jernigan*, 341
F.3d 1273, 1281-82 (11th Cir. 2003) ("Put simply, the fact
that [the defendant] knowingly possessed a firearm in a car on
a previous occasion makes it more likely that he knowingly
did so this time as well, and not because of accident or mis-
take.")

### 2. Necessity under Rule 404(b)

We also reject Byers's argument that the Coleman evidence
was not "necessary" as required by Rule 404(b). *See Queen*,
132 F.3d at 995. At trial, Byers created an issue over the iden-
tity of Haynes's assailant and made it central to the case. Pri-
marily through cross-examination, Byers attacked Lackl's
credibility as an effective witness and the reliability of his
identification placing Byers at the scene of the Haynes murder
by highlighting many problems with the Haynes murder pros-
ecution. Byers elicited evidence showing that there were
problems for state prosecutors to overcome in the Haynes
case and casting doubt on whether Byers had shot Haynes and
was, in fact, the person Lackl had seen fleeing and discarding
a gun: DNA recovered from the gun was linked to a gang
member who resided nearby; two witnesses in a nearby store
heard shots and saw someone running away, but were never
presented a photographic lineup; Lackl, as a habitual drug
user, could well have been mistaken; and Parham, the only
other witness, had recanted his identification of Byers.

Evidence is necessary "where it is an essential part of the
crimes on trial, or where it furnishes part of the context of the
crime." *United States v. Mark*, 943 F.2d 444, 448 (4th Cir.
1991) (internal quotation marks and citation omitted); *see
United States v. Smith*, 441 F.3d 254, 262 (4th Cir. 2006)

("Evidence is necessary, even if it does not relate to an element of a charged offense, when it furnishes part of the context of the crime." (internal quotation marks omitted)). Significantly, courts must determine whether prior bad acts evidence is "necessary" under Rule 404(b) in "light of other evidence available to the government." *Queen*, 132 F.3d at 998 (internal quotation marks omitted). Thus, "as the quantum of other non-Rule 404(b) evidence available to prove an issue unrelated to character increases, the need for the Rule 404(b) evidence decreases." *Lighty*, 616 F.3d at 354; *see id.* ("[I]f the Rule 404(b) evidence is *entirely cumulative* to other non-Rule 404(b) evidence available to the government, the Rule 404(b) evidence may not meet the necessity prong." (emphasis added)).

Of course, the inverse is true as well, such that Rule 404(b) evidence is more likely to become necessary where the evidence intrinsic to the crime at issue is sparse or weak. *See United States v. Wilson*, 624 F.3d 640, 654 (4th Cir. 2010); *United States v. DiZenzo*, 500 F.2d 263, 266 (4th Cir. 1974). Logically, then, when the evidence presented to the jury "generate[s] uncertainty" about motive or identity, "resort to . . . other crimes evidence [may be] appropriate." *United States v. Hadaway*, 681 F.2d 214, 218 (4th Cir. 1982); *cf. United States v. Lamarr*, 75 F.3d 964, 970-71 (4th Cir. 1996) (evidence necessary to prove lack of credibility is an issue separate from character and satisfies Rule 404(b)).

Byers's cross-examination of the government witnesses created a significant credibility issue, thereby "generat[ing] uncertainty" about whether Byers was the person who shot Haynes. *Hadaway*, 681 F.2d at 218. Because Detective Martin's testimony about Lackl's statements was the government's only evidence placing the gun in Byers's hand at the Haynes murder scene, Coleman's testimony was necessary to make more certain the identification made by Lackl and rebut Byers's attack on Lackl as a reliable witness. *See United States v. Gettel*, 474 F.3d 1081 (8th Cir. 2007) (explaining

that the government may refute defendant's attacks on witness testimony with Rule 404(b) evidence); *United States v. Hersh*, 297 F.3d 1233, 1254 n.31 (11th Cir. 2002) (same). Accordingly, we conclude that the government's evidence was also "necessary" for purposes of Rule 404(b).[6]

## B.

Byers next contends that the probative value of the Coleman evidence was outweighed by its prejudicial effect. Evidence sought to be admitted under Rule 404(b) must satisfy Rule 403's requirement that the probative value of the evidence must not be "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. "[G]eneral prejudice, however, is not enough to warrant exclusion of otherwise relevant, admissible evidence. Evidence may be excluded under Rule 403 only if the evidence is *unfairly* prejudicial and, even then, only if the unfair prejudice *substantially* outweighs the probative value of the evidence." *Siegel*, 536 F.3d at 319. In turn, unfair prejudice exists "when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the offered evidence." *Id.* Generally speaking, "bad acts" evidence, admissible under Rule 404, is not barred by Rule 403 where such evidence "did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged." *United States v. Boyd*, 53 F.3d 631, 637 (4th Cir. 1995).

Here, the Coleman shooting evidence is actually less sensational than the murder of Haynes, which was clearly admissible, or the murder of Lackl, which was carefully planned and

---

[6]On appeal, Byers does not challenge the reliability of the Coleman evidence. Accordingly, we need not address that requirement under Rule 404(b).

carried out in front of Lackl's daughters for the purpose of precluding Lackl's testimony and evading punishment for the murder of Haynes. With regard to the Coleman shooting, the evidence suggests that the incident was spontaneous and not the result of an elaborate plan. And, of course, the shooting did not result in Coleman's death.

Furthermore, the possibility of unfair prejudice from the Coleman testimony was abated by the *two* limiting instructions offered by the district court—one immediately before the Coleman evidence was presented to the jury and one immediately before jury deliberation. In the charge to the jury, the district court instructed "you may not consider the evidence of this alleged [Coleman incident] as a substitute for proof that the defendant committed a crime charged in the indictment. Nor may you consider this evidence as proof that the Defendant Byers is a criminal personality or bad character." J.A. 1589. *See United States v. White*, 405 F.3d 208, 213 (4th Cir. 2005) ("[A]ny risk of such prejudice was mitigated by a limiting instruction from the district court clarifying the issues for which the jury could properly consider [the] evidence."). Accordingly, we reject this argument as well.

In sum, we conclude that the district court did not abuse its discretion in admitting the Coleman evidence. The district court admitted the evidence in question for permissible purposes under Rule 404(b) and not merely to show general criminal disposition.

## C.

Finally, even if the district court abused its discretion in admitting evidence of the Coleman shooting, we conclude that the error was harmless. *See* Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."); *Lighty*, 616 F.3d at 355-56 (erroneous admission of prior bad acts evidence under Rule 404(b) subject to harmless-error analysis). Under the

harmless-error standard, we will not reverse if we can "say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997). The government introduced overwhelming evidence of Byers's guilt in planning and executing the murder of Lackl. In addition to direct testimony from Pearson that Byers ordered and paid for the hit on Lackl and the confession of the actual killer, the government presented substantial evidence establishing telephonic communication between Cornish the triggerman, Pearson, Goodman, and Byers on the day of the murder. The evidence also established an obvious motive for Byers to kill Lackl—the elimination of the sole remaining witness against him on state murder charges. In view of the strong evidence suggesting that Byers planned the murder-for-hire against Lackl, we can say with "fair assurance" that the evidence of Coleman's non-fatal shooting was harmless.

### III.

Byers next argues that the district court abused its discretion in permitting and failing to give a curative instruction regarding Malinda Humes's testimony that she warned Lackl his involvement as a witness would get him killed. We find no error.

Humes, Lackl's live-in girlfriend at the time of the Haynes murder, was at home when Lackl and Connie Mays returned from their trip to buy drugs on North Montford Street. Prior to trial, the district court granted the government's motion *in limine* to admit Lackl's statements to Humes under Rule 804(b)(6) of the Federal Rules of Evidence. *See* Fed. R. Evid. 804(b)(6) (providing exception to hearsay rule for "[a] statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the

unavailability of the declarant as a witness"). Accordingly, Humes recounted what Lackl told her about the incident:

>     He was real hyper and he said – he just kept pacing back and forth saying you won't believe what I just seen.

>     I said what happened? And [he] said he went into the alley to urinate, and he seen a man shoot another man, and the man ran past him and looked at him and laughed. And as he was laughing, he threw the gun up on the roof.

>     And he kept saying he wanted to call the police. And I told him don't get involved in it, that they would wind up killing him. He said he couldn't just sit back and let – I'm getting ahead of myself. I asked –

J.A. 483.

Byers did not object to this testimony or request a curative instruction with respect to Humes's statement that the suspects "would wind up killing him." The district court, however, called the lawyers to the bench *sua sponte* to clarify the limits on the court's pre-trial ruling that Lackl's statements could come in through Humes:

>     THE COURT:   I have overruled [Byers's] objection for reasons previously stated on the record, and [Humes] can testify as to Mr. Lackl's description of events and his description of the assailant, but we're not going to have this witness offer statements such as he couldn't stand by, et cetera.

>     It seems like that the witness was going to say [Lackl] didn't feel like he could stand by and not say anything. I don't think that's the ambit of my ruling.

> So you know what your witness is going to say, Mr. Purcell? I don't. I don't want her to get into describing what she saw.
>
> . . .
>
> Everything that Carl Lackl said . . . is not automatically subject to the wrongdoer exception admission.
>
> . . .
>
> [A.U.S.A.] PURCELL:   The only thing I think she's going to say based on my understanding is . . . that [Lackl] said he was going to call the police . . . .
>
> THE COURT:   That's . . . fine. I thought she was going to say some self-serving comments, what [Lackl] thought he should do as a citizen.

J.A. 484-85. Neither the court nor defense counsel addressed Humes's testimony that she believed Lackl's involvement would result in his murder.

When testimony resumed, Humes affirmed that Lackl indeed called the police about ten minutes after returning home. Byers successfully objected to a number of questions asking Humes to explain her response to Lackl's decision to report the shooting even though Byers had not objected to Humes's earlier testimony.

On appeal, Byers does not challenge the trial court's ruling that Lackl's statements to Humes were admissible. Rather, Byers contends that the district court erroneously allowed Humes to testify regarding her response to Lackl's decision to report the shooting to the police: "I told him don't get involved in it, that they would wind up killing him." J.A. 483. Byers apparently believes that Humes's statement was speculative and irrelevant because she was offering an opinion as

to the ultimate issue before the jury.[7] Because the testimony was unexpected and Byers interposed no objection after Humes blurted out her statement to Lackl, Byers is now essentially challenging the district court's failure to give a curative instruction *sua sponte* to the jury to disregard Humes's testimony that she was concerned Lackl's involvement would expose him to violent reprisal from Byers.

We review a district court's evidentiary rulings for abuse of discretion, provided the defendant preserves his objection at trial. *See Basham*, 561 F.3d at 325 & n.11. However, when an evidentiary issue is raised for the first time on appeal, our consideration is limited to plain error review. *See* Fed. R. Crim. P. 52(b). This court will notice the error only if the defendant can show: (1) error; (2) that is "clear or obvious, rather than subject to reasonable dispute"; (3) that affected substantial rights, "which in the ordinary case means . . . that it affected the outcome of the district court proceedings"; and (4) that "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009) (internal quotation marks omitted). Plain error review is "strictly circumscribed" and "[m]eeting all four prongs is difficult, as it should be." *Id.* at 1428, 1429 (internal quotation marks omitted).

Even if we assume that Humes's statement was improper and inadmissible, a district court does not commit plain error

---

[7]It is not clear precisely why Byers believes the statement was inadmissible. In his opening brief, Byers argued that Humes's testimony she told Lackl that he would be killed if he went to the police violated an earlier order of the district court. This argument proved to be factually inaccurate. The district court's only prior ruling regarding Humes's probable testimony was encompassed in an order granting the government's motion in limine to admit *Lackl's statements to Humes*. The ruling did not address anything Humes said to Lackl. In his Reply Brief, Byers conceded that there was no prior ruling addressing Humes's statements to Lackl and recast the argument solely as an objection to opinion testimony on "the ultimate issue for the trier of fact." Reply Brief at 12.

merely because it fails to give curative instructions *sua sponte* any time improper evidence comes out during trial. The unsolicited comment by Humes was brief and, as other courts have observed in similar circumstances, "a curative instruction could easily have done more harm than good by focusing the jurors on [testimony] that they otherwise might have missed or construed as innocuous." *United States v. Deandrade*, 600 F.3d 115, 119 (2d Cir. 2010); *see id.* (finding district court's failure to issue curative instruction *sua sponte* was not plain error in light of the additional fact that "[t]he government never relied upon the challenged testimony"). Presumably Byers did not immediately object to Humes's comment because the defense wished to downplay this testimony; a curative instruction could have undercut that very strategy. *See United States v. Copeland*, 51 F.3d 611, 616 (6th Cir. 1995) ("The defense claims that it did not raise an objection to these comments because '[t]o directly object each and every time would have only emphasized the prejudicial matter.' Arguably, a curative instruction would have emphasized this testimony, and, therefore, would have deprived the defense of its chosen trial strategy. Not issuing the instructions *sua sponte* under these circumstances was not reversible error.").

Furthermore, even assuming for the purposes of this appeal that the court's failure to act constituted plain error, we find that this error did not affect Byers's substantial rights given the volume of evidence supporting his convictions.

IV.

Goodman argues that the district court abused its discretion in permitting the government to call Michelle Fisher as a rebuttal witness. "Rebuttal evidence is defined as evidence given to explain, repel, counteract, or disprove facts given in evidence by the opposing party" or "[t]hat which tends to explain or contradict or disprove evidence offered by the adverse party." *United States v. Stitt*, 250 F.3d 878, 897 (4th

Cir. 2001) (internal quotation marks omitted). Evidence offered in rebuttal "may be introduced only to counter new facts presented in the defendant's case in chief." *Allen v. Prince George's County, Md.*, 737 F.2d 1299, 1305 (4th Cir. 1984). The decision of a trial court to allow rebuttal evidence is reviewed under an abuse of discretion standard. *See Hospital Bldg. Co. v. Trustees of The Rex Hosp.*, 791 F.2d 288, 294 (4th Cir. 1986).

The government introduced evidence that Goodman supplied Pearson with Lackl's home address, where the murder was subsequently committed. At trial, Pearson testified that Goodman had a Blackberry-style phone that he used to display Lackl's name, address and phone number. During the defendants' case, Goodman called his mother, Michelle Fisher, to testify that she purchased a T-Mobile Dash phone with a Blackberry-style keyboard for him in August 2007—after the murder was committed. Fisher's testimony, therefore, suggested that Pearson was mistaken or was being untruthful when he testified that Goodman gave him Lackl's address on a Blackberry-type phone. On cross-examination, Fisher admitted that the account had been opened in February 2007, but she testified that the Dash was a replacement phone that she obtained for Goodman in August 2007.

The government subsequently called Fisher as a rebuttal witness. The prosecutor asked Fisher a number of questions about whether she had received calls in April 2009, just prior to her testimony, from Goodman using a cell phone while he was incarcerated. Goodman objected to the government's line of questioning on the basis that it failed to counter any new evidence presented in Goodman's case-in-chief. The district court disagreed and concluded that the rebuttal testimony sought from Fisher "goes to the matter of . . . her credibility in terms of the use of the cell phone." J.A. 1193.

On appeal, Goodman renews his argument that the testimony the government sought to elicit from Fisher was not

proper rebuttal evidence. Because Fisher's testimony during Goodman's case-in-chief related to the Dash phone and T-Mobile account used by Goodman in 2007, Goodman contends that the questions posed by the government on rebuttal about phone calls at or near the time of trial had no connection to Fisher's earlier testimony.

Assuming without deciding that the district court abused its discretion in permitting the government to call Fisher as a rebuttal witness, we nevertheless conclude that any error was harmless and does not warrant reversal. The government failed to elicit anything incriminating from Fisher during her rebuttal testimony. In fact, counsel for Goodman during closing arguments commented on Fisher's re-taking the stand as a rebuttal witness and argued that none of the government's questions changed the evidence showing that Goodman did not have the Dash phone until after the murder and that, if anything, "it actually made Mr. Goodman look good because at least he called his mom on Easter." J.A. 1522. Considering the overwhelming evidence of Goodman's direct involvement in the plot to murder Lackl, we conclude that Fisher's testimony played no role in the outcome.

V.

Finally, Goodman challenges the district court's denial of his motion to suppress his post-arrest statements on involuntariness grounds. Goodman's primary contention is that Detective Ruby falsely promised that Goodman would not be charged in connection with the murder of Lackl, which ensured that Goodman "could not possibly have had the requisite level of comprehension of the nature of the right being abandoned and consequences of abandoning the right." Brief of Appellant at 32. When this court reviews the denial of a motion to suppress, we accept the district court's factual findings unless they are clearly erroneous, but we review de novo the district court's determination that Goodman's statements

were voluntary. *See United States v. Mashburn*, 406 F.3d 303, 306 (4th Cir. 2005).

"A statement is involuntary under the Fifth Amendment only if it is 'involuntary' within the meaning of the Due Process Clause." *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (en banc). In considering the voluntariness of a statement under the Due Process Clause, we must determine "whether the confession was extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (per curiam) (internal quotation marks omitted); *see United States v. Montgomery*, 555 F.3d 623, 629 (7th Cir. 2009) ("Given the right circumstances, a false promise of leniency may be sufficient to overcome a person's ability to make a rational decision about the courses open to him."). Of course, "[t]he mere existence of threats, violence, implied promises, improper influence, or other coercive police activity . . . does not automatically render a confession involuntary. The proper inquiry is whether the defendant's will has been overborne or his capacity for self-determination critically impaired." *Braxton*, 112 F.3d at 780 (internal quotation marks omitted). Courts must conduct this voluntariness inquiry in light of "the totality of the circumstances, including the characteristics of the defendant, the setting of the interview, and the details of the interrogation." *Id.* at 781 (internal quotation marks omitted).

Baltimore County detectives arrested Goodman, a 21-year-old high school graduate, at approximately 11:00 a.m. on September 5, 2007, and took him to the Baltimore County Police headquarters. Around noon, Goodman was placed in an interview room where he would ultimately remain for more than 14 hours. Goodman, however, does not question the *conditions* of his detention—the entirety of which was captured on videotape by Baltimore County Police Department—other

than its length. Goodman was permitted to use the restroom and he was provided food and drink.

Around 1:00 p.m., Detective Ruby gathered some personal data from Goodman. He told Goodman that they had "a lot to discuss" but explained that officers first wanted to go to Goodman's house and speak with his mother. While he waited for Detective Ruby to return, Goodman remained seated and cuffed to the wall. Detective Ruby returned to the interview room at about 6:30 p.m., after having executed a search warrant on the house where Goodman and his mother lived. He immediately advised Goodman of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), after which Goodman signed an acknowledgment and waiver of his rights.[8]

Initially, Goodman denied that he associated with Pearson and indicated that he last saw Pearson in mid-June. When Detective Ruby showed Goodman a picture of Byers, Goodman stated he might have seen Byers in jail but claimed that he did not know his name and denied that he ever talked to Byers. However, after Detective Ruby presented a visitor's log showing that Goodman had visited Byers in jail, Goodman admitted he knew Byers and his family. Goodman said he lied because he knew that Byers was suspected of murder and he did not want to be implicated in the wrongdoing. Goodman further conceded that he had actually spoken with Byers about the murder, but Goodman vigorously denied any involvement in the murder.

As the interview proceeded and Detective Ruby made it increasingly clear that the police suspected Goodman's involvement, Goodman began asking whether he would be charged in connection with the murder. On appeal, Goodman argues that Detective Ruby's responses amounted to a false promise that Goodman would not be charged.

---

[8]Goodman does not claim that Detective Ruby's issuance of *Miranda* warnings was deficient or unclear.

The first of these alleged promises occurred at 11:22 p.m., when Detective Ruby responded to Goodman's question about whether he would be charged:

> No, I didn't say right now. We're just sitting here talking about this. But we need to get down to the bottom of this, but when somebody asks me if they are getting charged . . . I can't tell that you are getting charged and I can't tell you that you're not getting charged, but . . . we haven't scratched the surface of what the truth is here and we're just starting to get to the truth.

Detective Ruby further explained that he knew Goodman was not the triggerman but that he also believed that Goodman had information about the murder that he had not yet disclosed. In a similar exchange at 12:20 a.m., after Goodman stated that he "didn't want to be involved in this at all," Detective Ruby responded, "well, you are [involved]." Goodman then asked, "So basically I'm being charged with being involved in [the] murder?" Detective Ruby answered, "You are being interviewed about being involved in a murder, about knowing what was going on." Detective Ruby then explained that the police had evidence pointing to Goodman's involvement in the murder, and he told Goodman that the interview would not stop until "we get to the bottom of this" and that there were "no time limits." Ultimately, however, the interview concluded at 2:20 a.m. At that point, Detective Ruby told Goodman unequivocally that he was being charged with first-degree murder and conspiracy. Goodman maintained his innocence in the murder scheme throughout the entire interview.

In denying the motion to suppress, the district court found that up until 11:22 p.m., when the first alleged "false promise" was made, there was "absolutely no indication of any kind of deception." J.A. 478. The district court likewise found that "[w]ith respect to statements after 11:22" there was no "will-

ful deception." J.A. 478. Accordingly, the district court concluded that there was no coercive conduct by Detective Ruby that would have "overborne" Goodman's will and rendered his statements involuntary.

Applying the totality of the circumstances standard, we agree that Goodman's statements were not unconstitutionally coerced. Having thoroughly reviewed the record, including the videotapes of Goodman's detention, we find no promises, implicit or otherwise, from Detective Ruby to Goodman. If Detective Ruby's statements about whether Goodman would be charged in the Lackl murder are viewed in context, it is clear that he never told Goodman he would not be charged. At worst, the detective's statements were somewhat equivocal; however, because Detective Ruby told Goodman that the police knew what happened and had evidence suggesting that Goodman was involved in the murder, Goodman could not have reasonably concluded that he would not face charges.

Moreover, there is no indication that Detective Ruby's statements "critically impaired" Goodman's "capacity for self-determination," *Braxton*, 112 F.3d at 780, or that Goodman's will "was overborne in such a way as to render his confession the product of coercion," *Arizona v. Fulminante*, 499 U.S. 279, 288 (1991). Goodman's position remained constant throughout the interview. Both before and after the purported "promises" from Detective Ruby, Goodman denied any actual involvement in the murder and admitted gaining knowledge only after the fact. Likewise, we perceive no coercion either from the length of time Goodman was detained before being formally notified of the specific charges or from the other circumstances surrounding Detective Ruby's interview of Goodman.

Accordingly, we affirm the district court's denial of Goodman's motion to suppress.

## VI.

For the foregoing reasons, we affirm the defendants' convictions.

*AFFIRMED*