Affirmed by published opinion. Judge Thacker wrote the opinion, in which Judge Diaz concurred. Judge Diaz wrote a separate concurring opinion. Judge Floyd wrote an opinion concurring in part and dissenting in part.
THACKER, Circuit Judge:
Jorge Avila Torrez (“Appellant”) was convicted of first-degree murder and sentenced to death. In this appeal, he raises a host of challenges to his conviction and death sentence. We find the challenges to his conviction to be without merit. As for sentencing, we focus on three specific challenges: (1) whether Appellant’s death sentence was unconstitutional because it was based solely on post-offense conviction ag-gravators; (2) whether the district court erred in failing to apply the categorical approach to state convictions that made him death penalty eligible; and (3) whether the district court erred by allowing Appellant to forego a mitigation defense without conducting a second competency evaluation and hearing. For the reasons explained below, we find no reversible error in the sentencing proceedings. Accordingly, we affirm Appellant’s conviction and sentence.
I.

Factual Background

We view the facts in the light most favorable to the Government, the prevailing party at trial. See United States v. Said, 798 F.3d 182, 186 n.2 (4th Cir. 2015).
A.

The Murder

On July 13, 2009, Amanda Snell was found dead in her room at Joint Base Myer-Henderson Hall, a residence hall on a military base located near Arlington, Virginia. When the 20-year-old Navy Intelligence Specialist did not show up for duty on Sunday night, July 12, two officers investigated and discovered her body in her room early the next morning. She was lying in an unnatural position at an angle on the floor of a wall locker, with her knees pressed into her torso and her feet pushed against a drawer. Her head was covered by a pillowcase and pushed down into her chest.
The Naval Criminal Investigative Service (“NCIS”) arrived at 7:45 a.m. on Monday, July 13, and began its investigation. Agents conducted a walk-through and inventory, took the temperature of the room and Snell’s body, took photographs, and took impressions of shoeprints in the vinyl floor in front of the wall locker. The agents noticed that the bed was made, with only a fitted sheet and a comforter, and the room was clean. Based on the information gathered on the morning of July 13, the medical examiner believed Snell had been dead for 24 to 36 hours or more. After conducting an autopsy, the examiner listed the cause of death as “undetermined.” J.A. 4099.[1] He noted there was “no recent or remote evidence of significant injury.” Id. at 4101. He did note moderate dysplasia of the atrioventricular nodal artery in the heart, which “has been associated with cardiac arrhythmias and sudden death,” but he did not attribute Snell’s death to this condition. Id. at 4104. The Government later retained a second medical examiner. *296 Based on the circumstances at the scene, this second medical examiner concluded that the cause of death was asphyxia, which can occur without any -visible injury.
Appellant lived down the hall from Snell. He, like others who lived near Snell, complied with NCIS’s request to complete a personal data sheet, in which he indicated that he did not know Snell and had never been in her room. He also consented to a search of his room and gave, a DNA sample.
B.

The Arlington Crimes

Snell’s murder remained unsolved until 2010, when Appellant was arrested for other crimes in Arlington County, Virginia. On February 10, 2010, Appellant attempted to abduct and assault M.N., a 26-year-old female who was walking to her boyfriend’s house in Arlington County. Appellant approached her from behind, grabbed her jacket, showed her a gun, and told her to keep quiet and keep walking. M.N. told Appellant, “[J]ust take my bag,” but he kept pushing her toward a tan Dodge Du-rango. J.A. 3631. He also pulled out a knife and “urge[d] [her] along to get into the car.” Id. at 3634. M.N. dropped her bag and ran away. Once she reached a nearby friend’s house, her friends called the police, but' neither Appellant nor M.N.’s bag was located.
A little more than two weeks later,, on February 27, 2010, two female graduate students, J.T. and K.M., were walking to KM.’s house in Arlington County. As they stopped in front of the house, Appellant emerged from behind a parked car. He moved his sweatshirt to the side to show the women he had a gun and demanded their- wallets. After the women told him they had no money, he forced them into KM.’s hoüse and ordered them to kneel down next to the couch, He bound their hands with a vacuum cord. At one point when Appellant left the room, the women were able to loosen their hands. Appellant returned to the room- with a knife and retied J.T.’s hands with an iron cord, and ordered the women to go to the bedroom. They complied, and when Appellant left the room again, J.T. managed to grab her cell phone and call 911. Appellant returned to the room, threw the cell phone against the wall, and then grabbed J.T. and led her outside to his SUV. He “showed [her] [his] gun” again and told her to get in his vehicle. J.A. 3649. After he drove for some time, he stopped, got in the back seat with J.T., and told her he was going to rape her. .He forced her to perform oral sex on him, and then he put on a condom (saying, “I’m not an idiot”) and raped her. Id. at 3652, He forced .her to perform oral sex again, and then covered her face with packing tape. He drove to a secluded area and forced J.T. to perform oral sex one more time. He then took J.T.’s scarf anti tightened it around her neck until she was unconscious. When she regained consciousness, she was face down in the snow with her hands above her head. Eventually, a passerby found her and called an ambulance.
Based on the description of Appellant’s vehicle and the similarities and locations of the two Arlington crimes, officers arrested Appellant on February 27, 2010, at Joint Base Myer-Henderson Hall.[2] Police searched Appellant’s Durango and found J.T.’s university ID and earring, packing tape, and a stun gun. In'his barracks room, they found a loaded Glock 22 pistol (which *297 was purchased on February 5) and multiple rounds of ammunition. They also seized his laptop and accessories, which contained dozens of sexually explicit videos and images depicting violent rapes and sexual assaults, and which were stored between April 2009 and February 2010. Many videos were “sleeping rape” videos, meaning “someone is sleeping and is attacked or raped.” J.A. 3731.
Appellant was convicted in Arlington County Circuit Court for abduction with intent to defile, robbery, use of a firearm in a felony, abduction, rape, breaking and entering while armed, and forcible sodomy. On December 10, 2010, the circuit court entered judgment, imposing five life sentences, followed by consecutive sentences totaling 168 years.
C.

The Zion Crimes

Five years prior to the'Arlington crimes, on May 8, 2005,- two young girls (Laura Hobbs and Krystal Tobias) were murdered in a park in Zion, Illinois, Appellant’s hometown. One witness saw the girls talking to someone who looked like Appellant, who at the time was 16 years old. When the girls did not return home that evening, a search party was deployed, and Hobbs’s father and grandfather eventually found the girls the next morning in a wooded area of the park. Authorities arrived and confirmed the girls were dead; their bodies had sustained multiple stab wounds. Hobbs was stabbed 20 times, including wounds to her abdomen, side, back, and horizontal stab wounds perforating her eyelids. One of the wounds punctured her liver. Officials also discovered a significant amount of male DNA in Hobbs’s right hand. .Tobias was stabbed 11-times, in her stomach,- intestines, liver, neck, windpipe, and cervical spine, causing significant hemorrhaging in her neck.
Within' days, officials arrested and charged Jerry Hobbs, Laura Hobbs’s father, who had a felony record. But after evidence collected during the autopsy was sent to the crime laboratory, Jerry Hobbs was excluded as a suspect based on DNA analysis. The lab also tested semen found on Hobbs’s clothing, vagina, rectum, and mouth, but officials were unable to determine a source. The DNA records were put into a nationwide database, and periodically, the state-DNA forensic examiner would check for a match. In June 2010, after Appellant was arrested for the Arlington crimes and his DNA entered into the system, the examiner found he was a potential match. Further testing showed that Appellant was' indeed a match for the clothing and 'vagina DNA, as only one in every 985 quadrillion individuals would be expected to have the same profile. He also could not be excluded as the source of the other DNA found in Hobbs’s right hand, anus, and mouth.[3]
' D.

Osama El-Atari

While he was awaiting trial for the Arlington crimes, Appellant was held in the Arlington County Detention Facility. Because , police officers suspected Appellant was planning to threaten and/or intimidate witnesses in the Arlington case, they arranged, for a federal inmate, Osama El-Atari, to act as a confidential informant and record conversations between the two of them. El-Atari recorded conversations over the course of approximately one week *298 in August 2010. During those conversations, Appellant admitted to suffocating Snell in her room, calling it “[t]he perfect crime.” J.A. 4307, 4325. However, his story-changed over time, and sometimes he indicated he was teasing El-Atari about the details of the crime. See, e.g., id. at 4331 (saying he strangled her); id. at 4319 (saying he choked her with a plastic bag); id. at 4335-36 (saying he choked her with a laptop cord); id. at 4315 (agreeing he pinned her down and “choke[d] [her] out”). He also bragged about crimes he did not commit, telling El-Atari he killed 23 people in total.
He told El-Atari that Snell was a random victim and he murdered her “for the adrenaline,” J.A. 4347; because “[he] got bored,” id. at 4377; and simply “because [he] could,” id. at 4322. He accurately described how he placed her body in the wall locker, except he told El-Atari he put a bag over her head, rather than a pillowcase. See id. at 4360 (“[S]he wouldn’t fit laying flat. I had to bend her fucking knees and make her like she’s sitting down, ’cause it’s a small closet.”). He said after he killed Snell, he made the bed and thoroughly cleaned the room. Appellant said he removed one of the bed sheets, but he left the fitted sheet.[4]
Upon hearing this information, NCIS expedited testing of the fitted sheet, and technicians discovered a semen stain consistent with Appellant’s DNA. State police had also seized Appellant’s Nike shoes after his arrest for the Arlington crimes. Based on Appellant’s statements to El-Atari, officials asked that those shoes be compared to the footwear impressions found in front of Snell’s wall locker. A government latent print examiner testified that the shoes that made the impressions were “consistent in size, design, and wear” with Appellant’s shoes. J.A. 3508.
Additionally, NCIS again interviewed Appellant. This time, he acknowledged knowing that Snell lived near him, but still said he had never been in her room.
II.

Procedural History

A.

Guilt Phase

On May 26, 2011, a federal grand jury returned an indictment charging Appellant with one count of first-degree murder of Amanda Snell. See 18 U.S.C. § 1111(a) (defining federal first-degree murder as the “willful, deliberate, malicious, [or] premeditated” killing of another). The indictment alleged statutory aggravating factors supporting a death sentence. Specifically, it charged .that Appellant was previously convicted of a state offense “involving the use or attempted use or threatened use of a firearm,” and that Appellant was previously convicted of two state offenses “involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person.” J.A. 56.
On February 29, 2012, the Government filed a notice of its intent to seek the death penalty. See J.A, 75-83 (the “Notice”). The Notice listed two statutory aggravating *299 factors: previous conviction of a felony involving the use or attempted or threatened use of a firearm; and two separate, previous convictions involving the infliction of, or attempted infliction of, serious bodily injury or death. The Notice listed the Arlington convictions in support of both aggravating factors. See id. at 76-78.- Before trial, Appellant filed two motions to strike the statutory aggravating factors, but the district court denied both requests.
Trial commenced on March 31, 2014. The Government called more than 30 witnesses over the course of four days and introduced hundreds of pages of exhibits. Appellant’s counsel cross-examined the Government’s witnesses, but only presented one witness, a former Marine who lived at Myer-Henderson Hall and testified that he had been in Snell’s room at one time, but lied about it because of a rule that members of the opposite sex should not be in a room together with the door closed. The jury returned a guilty verdict on the sole first-degree murder count on April 8, 2014.
B.

Penalty Phase

The district court bifurcated the penalty phase into (1) an eligibility phase, during which the jury determines whether a defendant is eligible for the death penalty based on statutory factors; and (2) a selection phase, during which the jury considers aggravating and mitigating factors and decides whether the death penalty is warranted. The eligibility phase began on April 21, 2014. As explained in more depth below, during that phase, the same jury that convicted Appellant found him eligible for the death penalty based on two statutory aggravating factors. The jury then proceeded to the selection phase, where it considered both statutory and non-statutory factors and unanimously recommended a sentence of death. Appellant chose not to present mitigating evidence. On May 30, 2014, the district court adopted the jury’s recommendation and sentenced Appellant to death. He noted this appeal the same day.
III.

Challenges to Murder Conviction

Appellant raises five challenges to his first-degree murder conviction: (1) whether the district court improperly limited Appellant’s confrontation rights when it conditioned the cross-examination of Osa-ma El-Atari on the admission of evidence of the Zion crimes; (2) whether the district court violated Rule 404(b) when it admitted evidence of the Arlington crimes and Appellant’s electronic media showing violent pornography; (3) whether the district court committed reversible error in allowing expert testimony on shoeprint analysis; (4) whether Appellant was denied his right to an impartial jury when the district court refused to allow him to ask potential jurors whether they would consider a sentence of life upon hearing evidence that Appellant had murdered two young children and sexually abused one of them; and (5) whether the Government’s use of cell site location information (“CSLI”) against Appellant violated his Fourth Amendment rights.[5]
A.

Cross-Examination of El-Atari

Part of Appellant’s defense strategy was to demonstrate that he was lying or exaggerating during the course of his jail con *300 servations with Osama El-Atari. Thus, defense counsel sought to cross-examine El-Atari about information Appellant gave that was false or “patently incredible,” including his representations to El-Atari .that he committed other crimes he could not have committed. Appellant’s Br. 129-30. However, the district court ruled that if Appellant proceeded with this line of questioning, the Government would be able to introduce conversations about the Zion crimes. See J.A. 3843 (“If you are going to get into other crimes ... and the fact th[at] he didn’t commit other crimes that he said he did, then I think it opens up Zion open wide.”); id. at 3845 (“My ruling is that as long as you don’t ... start asking about other murders that he has committed and other crimes that.aren’t within the transcripts presently, I am not going to allow the Zion 404(b) evidence.”). Based on this ruling, defense counsel chose not to cross-examine El-Atari about .the false or exaggerated statements relating to other crimes. Appellant contends the district court’s, decision to condition cross-examination of El-Atari oh evidence of the Zion crimes violated his Sixth Amendment rights. See Appellant’s Br, 129-30.
We hold that the district court did not abuse its discretion. To be sure, the main reason defense counsel would have wanted to introduce Appellant’s exaggerations and falsities was to show that everything he told El-Atari could have been false and mere boasting, including the information he gave about Snell’s death. The Government was entitled to rebut that argument with information Appellant gave to El-Atari about a crime he committed that was arguably true. Indeed, defense counsel acknowledged as much. See- J.A. 3843 (defense counsel “agreeing]” that asking El-Atari about the other crimes Appellant did not commit “opens up Zion ... wide”).
However, even if the district court erred in this regard, the error was harmless. See United States v. Madden, 38 F.3d 747, 753 (4th. Cir. 1994) (“[T]he test for harmlessness is whether we can say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.” (internal quotation marks omitted)). To the extent Appellant contends his cross-examination would have impeached El-Atari’s assertions that any lies Appellant told him were “minor” and would have allowed the jury to assess El-Atari’s “asserted competence as a lie detector,” Appellant’s Br. 141-42, defense counsel was able to cross-examine El-Atari about the following:
—El-Atari’s prior convictions for crimes involving deception;
—El-Atari’s attempts to deceive Appellant about why and how long he was in prison;
—El-Atari’s alleged failure to follow instructions from law enforcement;
—El-Atari’s desire to get out of prison.
And on direct examination, El-Atari testified about the inconsistencies in Appellant’s statements about the Snell murder, and he also testified that Appellant said he was deliberately making false statements so their discussions would be unable to be used against him.
Under these circumstances, it is difficult to fathom how cross examining El-Atari about additional falsities Appellant relayed to him would have made much difference, given that the jury already knew to approach Appellant’s statements to El-Atari with caution, knowing that he deliberately (and admittedly) lied at certain points in his jailhouse conversations. For these reasons, Appellant’s argument on this point fails.
*301 B.

Rule 401p(b) Evidence

Appellant next argues that admitting evidence of the Arlington crimes, and Appellant’s electronic media, which contained violent pornography, violated Rule 404(b) of the Federal Rules of Evidence. Rule 404(b) “prohibits evidence of other crimes, wrongs, or acts solely to prove a defendant’s bad character, but such evidence may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge,' identity, or absence of mistake or accident.” United States v. Byers, 649 F.3d 197, 206 (4th Cir. 2011) (alterations and internal quotation marks omitted). This Court has articulated a four-prong test to determine the admissibility of prior-act evidence under Rule 404(b):
(1) The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the defendant.... (2) The act must be necessary in - the sense that it is probative of an essential claim or an element of the offense. (3) The evidence must be reliable. And (4) the evidence’s probative valué must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process.
United States v. Queen, 132 F.3d 991, 997 (4th Cir. 1997). We review for abuse of discretion. See, Byers, 649 F.3d at 206.
The Government produced evidence of pornographic videos showing violence against women who were sleeping, unconscious, or restrained. This evidence was admitted to show intent and motive, as well as modus operandi since Snell was murdered in the early morning in her bed, and officials discovered Appellant’s semen on her bed sheets. See, e.g., United States v. Blauvelt, 638 F.3d 281, 292 (4th Cir. 2011) (upholding admission under Rule 404(b) of adult pornographic videotapes in order to prove identity, motive, and intent in child pornography case); United States v. Brand, 467 F.3d 179, 197 (2d Cir. 2006) (upholding admission under Rule 404(b) of evidence that a defendant possessed child pornography to show the defendant’s “sexual interest in children” and thus demonstrate his intent in traveling across state lines to meet a minor (internal quotation marks omitted)); United States v. Smith, 103 F.3d 600, 603 (7th Cir. 1996) (explaining that a common form of evidence offered to prove who omitted a crime is “modus operandi” evidence, which is “evidence that shows a defendant’s distinctive method of operation”). It was not an abuse of discretion for the district court to admit this evidence.
As for the Arlington crimes, the circumstances surrounding the offenses against M.N., J.T., and K.M. mere months after Snell’s murder were relevant and necessary to demonstrate Appellant’s mo-dus operandi, motive, and intent, These offenses resembled Snell’s murder in the following ways: (1) they- all involved assaults on women Appellant did not know (well or at all) in their early to mid 20s; (2) they all took place in the early morning hours; (3) the motive appeared to be sexual, as evidenced by the semen on Snell’s bed, the rape of J.T., and Appellant’s forcing of M.N. to get into -his. car; (4) the Snell murder (based on statements Appellant made to El-Atari) and the February 27 offense both involved tying up women with cords from electronics found in the victim’s living space; (5) the Snell murder (based on statements Appellant made to El-Atari) and February 27 offense both involved strangling; (6) there.was no semen found in Snell, but it was found on her bedsheet, and on February 27, Appellant used. a *302 condom when raping J.T., telling her “I’m not an idiot.” J.A. 3652.
Although the crimes were certainly not identical, they “need not be”; rather they “must be similar enough to be probative of intent.” United States v. Van Metre, 150 F.3d 339, 350 (4th Cir. 1998) (internal quotation marks omitted) (upholding admission under Rule 404(b) of evidence of a prior abduction and sexual assault by the defendant of someone other than the victim, in order to show that the defendant’s “purpose in abducting [the victim] was, from the very start, for his own sexual gratification”). And the time between the crimes is within the permissible realm. See United States v. Hadaway, 681 F.2d 214, 217 (4th Cir. 1982) (upholding evidence of conduct committed 18 months after the crime charged and explaining, “subsequent conduct may be highly probative of prior intent. That one has thought in a particular illegal way over a period of time is evidence that one’s thought patterns had already been so developed and were so operating on another previous occasion”).
Nor was the evidence more prejudicial than probative. This court has held “bad acts evidence, admissible under Rule 404, is not barred by Rule 403 where such evidence did not involve conduct any more sensational or disturbing than the crimes with which the- defendant was charged.” Byers, 649 F.3d at 210 (internal quotation marks omitted). As disturbing and sensational as the Arlington crimes were, a murder of a young woman in her own bedroom is even more so. Moreover, the district court gave limiting instructions and excluded evidence of J.T.’s "condition after Appellant left her on the side of the road and her resulting health problems, any evidence about the Arlington crimes that was not presented in the state court trial, and any evidence about Appellant’s attempt to threaten or intimidate witnesses to the Arlington crimes. See United States v. Kibler, 667 F.2d 452, 455 (4th Cir. 1982) (recognizing the judge’s limiting instructions “[can] reduce[ ]. the likelihood of any prejudice”). For these reasons, Appellant’s Rule 404(b) argument fails.
C.

Shoeprint Analysis

Appellant next challenges the district court’s admission of testimony from a latent print examiner. That expert testified that the shoes that made the impressions on the vinyl floor in front of Snell’s wall locker were “consistent in size, design, and wear” with the Nike shoes taken from Appellant in February 2010. J.A. 3508. Even assuming the district court should have excluded the shoeprint analysis testimony, we can say with fair assurance that the judgment was not substantially swayed by the error. It is simply not probable that this evidence affected the jury’s verdict, given that the jury also knew Appellant’s DNA was on Snell’s bed sheet, and Appellant described to El-Atari in great detail how he killed Snell and shoved her in the wall locker. Thus, we reject this claim under harmless error review. See United States v. Hedgepeth, 418 F.3d 411, 421 (4th Cir. 2005).
D.

Voir Dire

Finally, Appellant claims he was denied his Sixth Amendment right to an impartial jury when, in voir dire, the jurors were not asked this question, proposed by Appellant:
2. The government in this case may introduce evidence that Jorge Torrez committed a sexual assault and murder of an eight-year-old girl as well as the murder of a nine-year-old girl.
[[Image here]]
*303 b. If you find Mr. Torrez guilty, then in the penalty phase of trial, would this evidence affect your ability to fairly weigh the aggravating factors against the mitigating factors and return a sentence of life without the possibility of release, or would you find it difficult to vote for life without the possibility of release?
J.A. 1799-1800 (bold type omitted).[6] Instead, the district court said to the jurors: “I will tell you now that there may also be evidence introduced about other crimes that the Government believes that [Appellant] has committed, and those would include assault, sexual assault, and abduction, and it may include child victims.” Id. at 1928. The court did not, however, mention murder.
The district court did not abuse its discretion in rejecting Appellant’s proposed voir dire question. See Rosales-Lopez v. United States, 451 U.S. 182, 189, 101 S.Ct. 1629, 68 L.Ed.2d 22 (1981) (“[Federal judges [are] accorded ample discretion in determining how best to conduct the voir dire.”). In United States v. Caro, we explained:
district courts must conduct “adequate voir dire” to enable them “to remove prospective jurors who will not be able impartially to follow the court’s instructions and evaluate the evidence.” Because “[a]ny juror who would impose death regardless of the facts and circumstances of conviction cannot follow the dictates of law,” the Supreme Court has held that “[a] defendant on trial for his life must be permitted on voir dire to ascertain whether his prospective jurors function under such misconception.”
597 F.3d 608, 614 (4th Cir. 2010) (quoting Rosales-Lopez, 451 U.S. at 188, 101 S.Ct. 1629; Morgan v. Illinois, 504 U.S. 719, 735-36, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992)).
There, we upheld the district court’s choice to ask, “Are your feelings about the death penalty such that you would always vote for a sentence of death as a punishment for someone convicted of a death penalty eligible offense, regardless of the facts and circumstances?,” Caro, 597 F.3d at 615, rather than “Do you feel that anyone convicted of intentional and pre-medi-tated murder deserves to get the death penalty? If not, what kind of case does or does not deserve the death penalty?,” id. at 614 (emphasis supplied). We explained that the question asked by the district court “adequately enabled the district court to weed out prospective jurors irrevocably committed to imposing the death penalty.” Id. at 615 (citing Witherspoon v. Illinois, 391 U.S. 510, 522 n.21, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (excluding a juror who is “irrevocably committed ... to vote against the penalty of death regardless of the facts and circumstances” does not violate the Sixth Amendment)); see also United States v. Tipton, 90 F.3d 861, 878 (4th Cir. 1996) (finding satisfactory the questions of whether jurors “ha[d] strong feelings in favor of the death penalty” and if so, whether they “would always vote to impose the death penalty in every case where a defendant is found guilty of a capital offense”). Indeed, we have rejected “the suggestion that the trial court was required to ask potential jurors whether they would automatically impose the death penalty in rape-murder cases because ... crime-specific voir dire questions” are not required. Oken v. Corcoran, 220 F.3d 259, *304 266 n.4 (4th Cir. 2000) (emphasis supplied) (citing Morgan, 504 U.S. at 728, 112 S.Ct. 2222). The district court’s question in this case was much more specific than the questions we found sufficient in Oleen and Caro. Therefore, Appellant’s argument on this point fails as well. ,
E.

Conclusion

For the foregoing reasons, we hold Appellant’s challenges to his conviction to be without merit and therefore affirm his conviction.
■IV.

Challenges to Death Sentence

In reviewing a capital sentence, we must (1) “address all substantive and procedural issues raised on the appeal of a sentence of death”; (2) “consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor”; and (3) “consider whether the evidence supports the special finding of the existence of an aggravating factor required to be considered under [18 U.S.C. § ] 3592.” 18 U.S.C. § 3595(c)(1). For any error in the sentencing proceeding, the government must “establish[ ] beyond a reasonable doubt that the error was harmless.” Id. § 3595(c)(2).
A.

Use of Post-Offense Conduct as Statutory Aggravator

We first consider Appellant’s argument that the death penalty was unconstitutionally imposed bécause it was based on conduct and convictions that occurred after the Snell murder. We review this issue de novo. See United States v. Runyon, 707 F.3d 475, 502 (4th Cir. 2013).
1.
Under the Federal Death Penalty Act (“FDPA”), once the jury finds the defendant guilty of an offense for which a death sentence is provided, the trial proceeds to the penalty phase. In a homicide case, the jury must make certain determinations before it can impose the death penalty. Some courts, including the district court in this case, choose to bifurcate the penalty phase into an “eligibility” phase and a “selection” phase — which, along with the guilt phase, result in an overall trifurcated proceeding.[7]
In the eligibility phase, the jury must find beyond a reasonable doubt that the defendant;
(A) intentionally killed the victim;
(B) intentionally inflicted serious bodily’injury that resulted in the death of the victim;
(C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; 'or
(D) intentionally and specifically engaged in an act of violence, knowing that *305 the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act[.]
18 U.S.C. § 3591(a)(2)(A)-(D). Also in the eligibility phase, the jury must .find beyond a reasonable doubt the existence of at least one of sixteen statutory aggravating factors. See 18 U.S.C, § 3593(e); id. § 3592(c) (1) — (16). .
Once the above requirements are satisfied, the defendant is eligible for the death penalty, and the proceedings continue in the selection phase, where jurors consider the presence of aggravating and mitigating factors and decide whether to recommend the death penalty. The jury must determine whether aggravating factors, both statutory and non-statutory, “sufficiently outweigh” the mitigating factors presented by the defendant to justify a death sentence, “or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify5’ that sentence. 18 U.S.C. § 3593(e).
In the case at hand, Appellant’s murder conviction provides for a sentence of death. See 18 U.S.C. § 1111 (providing, “Whoever is guilty of murder in the first degree shall be punished by death or by imprisonment for life”). During the eligibility phase, the jurors found that each of the intent requirements was met with respect to Appellant’s murder of Snell, and it also found that two statutory aggravating factors were satisfied, based on Appellant’s Arlington crime convictions:
• The defendant “has previously been convicted of a Federal or State offense punishable by a term of imprisonment of more than 1 year, involving the use or attempted or threatened use of a firearm ... against another person”; and
• The defendant “has 'previously been ■ convicted of 2 or more .,, State offenses, punishable by a term of .imprisonment of more than 1 year, committed on different occasions, involving the infliction of, or attempted infliction of, serious bodily injury or death upon another person.”
18 U.S.C.. § 3592(c)(2), (4); see J.A. 5233-34. Filially, during the selection phase, the jury decided that the following non-statutory aggravating factors were proven:
• Appellant killed Krystal Tobias and Laura Hobbs on May 8, 2005, stabbing Krystal 11 times and Laura approximately 20 times, including in both eyes.
• Appellant sexually assaulted Laura Hobbs on May 8,2005.
.• Appellant stalked females with the intent of sexually assaulting them during the late night hours of February 4 and the early morning hours of February 5, 2010, in Arlington County, Virginia.
• On February 5, 2010, Appellant purchased a Glock semiautomatic pistol to use in abducting, robbing, and sexually assaulting female victims.
• On February 10, 2010, Appellant abducted M.N. at gunpoint, brandished a knife, robbed her,, and tried to - force her. into his Dodge Durango.
• On February 27, 2010, Appellant abducted K.M. and J.T. at gunpoint and demanded money from them. He then forced - them inside KM.’s house, where he tied them up.
• On February 27, 2010, Appellant grabbed J.T. and forced her at gunpoint out of the house into his Dodge Durango. After driving for a while, he forced h¿r to perform oral sex, bound her hands, raped her, and . again forced her to perform oral sex. *306 He then bound her mouth and head with tape and pushed her to the floor.
• On February 27, 2010, Appellant drove with J.T. on the floor of his vehicle and stopped in a wooded area. He again forced J.T. to perform oral sex on him.
• On February 27, 2010, Appellant attempted to kill J.T. by strangulation (wrapping a scarf around her neck and tightening it). J.T. lost consciousness. Appellant dumped her in the woods, but J.T. regained consciousness and was able to flag down a car. She was seriously injured.
• On February 27, 2010, Appellant was arrested. He was found in possession of a stun gun and tape in his vehicle, along with J.T.’s personal property.
• While incarcerated and awaiting trial for the Arlington crimes, Appellant plotted to have the victim witnesses against him killed.
• While incarcerated and awaiting trial for the Arlington crimes, Appellant possessed a “shank,” commonly used by prisoners to kill others.
• Appellant has displayed no remorse for Snell’s murder; rather, he bragged about it.
• Appellant “poses a future danger to others in that he is likely to commit, and direct others to commit, additional acts of violence in any setting, including acts of violence and threats of violence against witnesses who have testified against him.”
• Appellant caused injury, harm, and loss to the victim and victim’s family and friends, “as evidenced by the victim’s personal characteristics and by the impact of her death upon the victim’s family and friends.”
J.A. 5235-38. Despite the fact that Appellant chose to present no mitigating evidence, seven of 12 jurors found one mitigating factor: that Appellant “was under the age of 18 at the time Laura Hobbs and Krystal Tobias were killed.” Id. at 5239.
2.
Appellant contends he was not actually eligible for the death penalty, as the only statutory aggravating factors found by the jury “cannot qualify as ‘previous convictions’ because they occurred after commission of the [capital] offense.” Appellant’s Br. 15 (capitalization omitted). The district court, however, rejected Appellant’s motion to strike these factors, concluding that any predicate convictions occurring prior to sentencing would satisfy § 3592(c)(2) and (c)(4).
a.
This court addressed and rejected this very argument in United States v. Higgs. See 353 F.3d 281 (4th Cir. 2003). Dustin Higgs was convicted of three counts of first-degree murder committed in the perpetration of kidnapping, three counts of first-degree premeditated murder, three counts of kidnapping resulting in death, and three counts of using a firearm during and in relation to a crime of violence. See id. at 289. All charges stemmed from events of one night, when Higgs and a companion forced three women into a car, drove them to a federal park area, and Higgs’s companion shot each of them to death. See id. at 289-90. The jury found three statutory aggravators supporting a death sentence on the kidnapping and murder counts (multiple killings in a single criminal episode, a prior firearm conviction, and a prior drug conviction) and an additional aggravator (death during commission of another crime) for the murder counts. See id. at 300. Higgs was ultimately sentenced to nine death sentences under the FDPA, one for each murder and kid *307 napping count, plus a 45-year sentence for the firearm offenses. See id. at 295.
One of the myriad arguments Higgs raised was that his drug conviction, rendered after the murder but before sentencing, was not actually a “previous[]” conviction that could qualify as a statutory aggravator. See 18 U.S.C. § 3592(c)(12) (listing as an aggravating factor, “The defendant had previously been convicted of violating title II or III of the Comprehensive Drug Abuse Prevention and Control Act of 1970 for which a sentence of 5 or more years may be imposed” (emphasis supplied)). The district court denied Higgs’s motion to strike this aggravator. See Higgs, 353 F.3d at 317.
We affirmed, holding, “[T]he § 3592(c)(12) statutory aggravating factor encompasses all predicate convictions occurring prior to sentencing, even those occurring after the conduct giving rise to the capital charges.” Id. at 318 (emphasis in original). We explained:
Although it easily could have done so, Congress did not specify that either the prior offense or conviction had to occur before the death penalty offense. On the contrary, the entire section speaks in terms of those things that must be considered when the death sentencing hearing is conducted and the petit jury begins its weighing process. And, we note that where Congress has intended a different practice in other circumstances, it has made that intent clear.
Higgs, 353 F.3d at 318 (quoting 21 U.S.C. § 841(b)(1)(C) (providing for an enhanced penalty “[i]f any person commits such a violation after a prior conviction for a felony drug offense has become final”); 18 U.S.C. § 922(g)(1) (stating “[i]t shall be unlawful for any person .,. who has been convicted ... to [commit specified violations]”) (emphases supplied)).
The district court in this case relied heavily on Higgs in concluding that (c)(2) and (c)(4), which use very similar language,[8] must also encompass any convictions occurring before sentencing. We agree that we are bound by Higgs on this point. We see no legitimate reason to distinguish (c)(12) from (c)(2) and (c)(4), all of which contain the phrase “previously been convicted.” And Appellant makes no attempt to distinguish the aggravators based on the words “has” and “had,” as that argument is also foreclosed by Higgs. See 353 F.3d at 319 (concluding the “grammatical difference” between has and had “is far too tenuous a basis upon which to conclude that Congress intended that the prior serious drug offense aggravating factor for homicide was to be treated differently than every other prior conviction aggravating factor”). Therefore, we are constrained to conclude that convictions occurring after the murder but before capital sentencing qualify as “previous[ ]” convictions under (c)(2) and (c)(4). See Mentadlos v. Anderson, 249 F.3d 301, 312 n.4 (4th Cir. 2001) (“[A] panel of this court cannot overrule, explicitly or implicitly, the precedent set by a prior panel of this court. Only the Supreme Court or this court sitting en banc can do that,”).
b.
Appellant’s attempts to distinguish Higgs are unavailing. To begin, he claims that the Higgs court “was not asked to decide the constitutional arguments implicated in this case, so [it] cannot be said to have decided them.” Appellant’s Br. 34-35. While the nuanced ex post facto, Eighth Amendment, and Fifth Amendment arguments raised 'here (explained in depth, m- *308 fra) were not raised in Higgs, we nonetheless cannot ignore its conclusion that as a matter of statutory interpretation, the (c)(12). aggravating factor encompasses all predicate. convictions occurring prior to sentencing.
Appellant also contends the district court failed to recognize two “critical distinctions” between Higgs and this case. Appellant’s Br. 35. We address each in turn. -
i.
First, Appellant contends that at the time of the trial in Higgs, the Supreme Court had not yet decided Ring v. Arizona, 536 U.S. 584, 609, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and thus, “statutory aggravators were not viewed as elements of the offense,” so post-offense conduct was “not functioning as an element of capital murder.” Appellant’s Br. 35. Ultimately, however, the distinction between elements and sentencing factors does not directly affect whether Higgs' interpretation of § 3592(c)(12) applies to this case.
As a matter of background, in Ring, the Supreme Court held that statutory aggra-vators that increase the punishment for a crime “operate as ‘the functional equivalent of an element of a greater offense,’ [and] the Sixth Amendment requires that they be found by a jury.” 536 U.S. at 609, 122 S.Ct. 2428 (quoting Apprendi v. New Jersey, 530 U.S. 466, 494 n.19, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)); see also id. at 605, 122 S.Ct. 2428 (“If the legislature defines some core crime and then provides for increasing the punishment of that crime upon a finding of some aggravating 'fact, the core crime and the aggravating fact together constitute an " aggravated crime, just as much as grand larceny is an aggravated form of petit larceny. The aggravating fact is an element of the aggravated crime.” (alterations omitted) (quoting Apprendi, 530 U.S. at 501, 120 S.Ct. 2348 (Thomas, J., concurring))).
Before Ring, however, the Supreme Court had concluded that the fact of a prior conviction which increases the maximum penalty for a crime is not an element of a separate crime; rather, it is a “penalty provision” that merely “authorizes an enhanced penalty.” Almendarez-Torres v. United States, 523 U.S. 224, 226, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998); see also Jones v. United States, 526 U.S. 227, 248, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) (“[T]he precise holding [in Almendarez-Torres] that recidivism increasing the maximum penalty need not be so charged ... rested in substantial part on the tradition of regarding recidivism as a sentencing factor, not as an element to be set out in the miiictment,”). The Apprendi Court explained,
Both the certainty that procedural safeguards attached to any “fact” of prior conviction, and the reality that Almen-darez-Torres did. not challenge the accuracy of that “fact” in his case, mitigated the due process and Sixth Amendment concerns otherwise implicated in allowing a judge to determine a “fact” increasing punishment beyond the maximum of the statutory range.
530 U.S. at 488, 120 S.Ct. 2348 (footnote omitted). And Ring itself made clear that because Ring’s sentence did not involve an aggravating circumstance related to a pri- or conviction, he did “not challenge Almendarez-Torres.” Ring, 536 U.S. at 597 n.4, 122 S.Ct. 2428. Thus, Ring explicitly left unresolved the question of whether prior convictions could serve as functional elements of capital murder.
Against that backdrop, the defendant in Higgs asked this court to find his indictment fatally flawed in part because it did not list the prior conviction aggravating factors applicable to his death sentence. *309 See Higgs, 353 F.3d at 300. We recognized, however, that “with the exception of the fact of prior convictions, those intent and aggravating factors which the government intends to rely upon to render a defendant death-eligible under the FDPA are the functional equivalent of elements of the capital offenses and must be . charged in the indictment, submitted to the petit jury, and proved beyond a reasonable doubt,” Id. at 298 (emphasis supplied). Thus, we held that Higgs’s indictment was not defective even though the prior conviction aggravators were not alleged therein: they were simply not the “functional equivalent of elements of the capital offenses.” Id. at 298; see also id. at 301-02.
We also discussed the impact of Ring, which had been decided during the appeal of Higgs’s convictions and sentences. Although we recognized “Ring [may have] placed on shaky ground the Almendarez-Torres proposition that prior convictions that increase the maximum penalty need not be alleged in the indictment,” we nonetheless concluded that “[u]ntil the Supreme Court overrules Almendarez-Torres, we are bound to follow its holding.” Id. at 303; see also United States v. Bullette, 854 F.3d 261, 264 n.2 (4th Cir. 2017) (“Although the Supreme Court has expressed doubt about the continuing validity of Al-mendarez-Torres, it remains good law, and we may not disregard it unless and until the Supreme Court holds to the contrary.” (internal quotation marks omitted)).[9]
On Appellant’s view, Higgs concluded that the prior conviction aggravators in that case functioned as “sentencing factors” only because other valid aggravating factors existed to make Higgs death eligible (i.e., murder during the commission of another offense). Appellant’s Br. 37. In Appellant’s exceedingly rare case, though, another valid aggravator did not exist, which Appellant says makes all the difference. Whatever the merits of Appellant’s claim in the abstract, it need not detain us here, for the Government in this case did list the two prior, conviction statutory ag-gravators in the indictment, and the jury found the existence of those aggravators béyond a reasonable doubt. Thus, the only issue for us is whether to apply Higgs’ interpretation of § 3592(c)(12) to (c)(2) and (c)(4). That interpretive decision, holding that prior conviction statutory aggrava-tors — like § 3592(c)(12) — include conduct occurring after the capital offense but before sentencing, depended on an analysis of legislative intent and language in other statutory schemes. While Higgs may have justified the effects of its interpretive decision by referencing the Almendarez-Torres exception, 353 F.3d at 319 n.9, its reasoning did not depend solely on treating prior conviction statutory aggravators *310 as sentencing factors rather than elements. Thus, Higgs’ interpretation of § 3592(c)(12) applies to the other prior conviction aggravators in § 3592(c), including (c)(2) and (c)(4), regardless of whether we treat prior conviction aggravators as sentencing factors or elements.
ii.
Second, Appellant notes that in Higgs, the sentencing proceeding was bifurcated, rather than trifurcated. However, there is no indication that Higgs’ s conclusion hinged on the fact that all of the aggrava-tors were considered together in one proceeding. Appellant’s argument on this point assumes that the prior convictions were treated only as selection factors, not as statutory aggravators bearing on eligibility. This assumption is wrong. While it is true that Higgs stated — in the context of Higgs’s Fifth Amendment indictment challenge — that as long as one valid statutory aggravator is alleged in the indictment, any additional factors “can be fairly viewed as sentencing considerations,” it nonetheless analyzed the post-offense conduct statutory argument as if Higgs’s prior drug conviction were a statutory aggravator, Higgs, 353 F.3d at 299, 317-19. Only after this analysis did this court provide an alternative reason for affirmance: there were other statutory aggravators present. Therefore, this argument does not render Higgs inapposite.
c.
Appellant’s remaining constitutional challenges to his death sentence are foreclosed by the language and operation of the FDPA and our precedent.
i.

Ex Post Facto Claim

Appellant contends that “[a]llow-ing an element of the offense to occur post-offense and retroactively render a pri- or murder ... capital murder would violate ex post facto principles.” Appellant’s Br. 29. Article I, section 9 of the United States Constitution provides, “No ... ex post facto Law shall be passed.” U.S. Const, art. I, § 9, cl. 3. The ex post facto clause “looks to the standard of punishment prescribed by a statute [and] forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer.” Lindsey v. Washington, 301 U.S. 397, 401, 57 S.Ct. 797, 81 L.Ed. 1182 (1937); see also id. (“It could hardly be thought that, if a punishment for murder of life imprisonment or death were changed to death alone, the latter penalty could be applied to homicide committed before the change.”).
Nothing about § 3592(c)(2) or § 3592(c)(4) changed between the time of Snell’s murder and the time of Appellant’s sentencing. Thus, this issue turns on whether the district court’s interpretation of § 3592(c)(2) and (c)(4) can function as a “Law” under the ex post facto clause. Appellant cites Bouie v. City of Columbia for the proposition that it can; however, Bowie reasoned that when an “unforeseeable” construction of a criminal statute is applied retroactively to subject someone to punishment for past conduct, the ex post facto clause, as well as due process concerns, are implicated. 378 U.S. 347, 353-55, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). It was certainly not “unforeseeable” that Appellant’s murder could be elevated to capital murder based on a subsequent qualifying conviction — that is precisely what happened in Higgs. Cf. Glenn v. Johnson, 761 F.2d 192, 195 (4th Cir. 1985) (“Since the interpretation of the statute was not only foreseeable but indeed was inescapable, the plaintiffs simply have no case.”).
*311 Further, Appellant’s attempt to rely on Higgs on this point is unfounded. We decided in Higgs whether the “multiple killings in a single criminal episode” ag-gravator was properly applied, since that aggravator was not added to the FDPA until after the murders at issue in Higgs. We found an ex post facto violation occurred because the addition of that subsection of the statute “alter[ed] the elements of the offense or the quantum of punishment” and clearly “increase[d] the punishment for criminal acts” after the conduct was committed. 358 F.3d at 301. Here, in contrast, the aggravators which ultimately made Appellant death-eligible were part of the FDPA before the Snell murder. Thus, Appellant’s ex post facto argument fails.
ii.

Eighth Amendment Claim

Appellant also claims the use of post-offense conduct to make a defendant eligible for the death penalty violates the Eighth Amendment, which provides that “cruel and unusual punishments [shall not be] inflicted.” U.S. Const, amend. VIII. The Supreme Court has explained that to pass constitutional muster, the aggravating circumstance that serves to make a defendant death eligible must meet two requirements: first, it “must genuinely narrow the class of persons eligible for the death penalty”; and second, it “must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.” United States v. Caro, 597 F.3d 608, 623 (4th Cir. 2010) (quoting Zant v. Stephens, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)).
First, using post-offense convictions would narrow the class of defendants convicted of murder. Although Appellant argues that the previous conviction aggrava-tors can expand the class of murderers subject to capital punishment if the offender later commits another crime, that is not the focus of the Eighth Amendment analysis. Instead, the focus is on whether the class of offenders is narrowed from all murderers, not the class of offenses. Cf. Higgs, 353 F.3d at 318 (suggesting prior conviction aggravators like (c)(12) “do[] not concern matters directly related to the death penalty offense [but] [r]ather [are] concerned with the characteristics of the offender as of the time that he is sentenced”). And although this interpretation expands the class of offenders with previous convictions, it nonetheless narrows the class of all murderers to only murderers with previous convictions,
Second, as to whether § 3592(c)(2) and (c)(4) reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder, see Caro, 597 F.3d at 623, we have explained, “one can hardly dispute the congressional wisdom that recidivism justifies harsher sentencing. Defendants with significant criminal histories demonstrate unwillingness or inability to follow the law. This justifies imposing harsher sentences to provide increased retribution and deterrence,” id. at 623-24.
A more challenging aspect of this inquiry is whether the statute imposes the death penalty on these recidivists in a non-arbitrary and unambiguous way. Along these lines, a court “must first determine whether the statutory language defining the [aggravating] circumstance is itself too vague to provide any guidance to the sen-tencer.” Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (quoting Arave v. Creech, 507 U.S. 463, 471, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993)); see also Gregg v. Georgia, 428 U.S. 153, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.) (The “discretion ... afforded a *312 sentencing body ... must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action”)-
We acknowledge that permitting post-offense' convictions to qualify as statutory aggravators may allow for prosecuto-rial manipulation of the timing of charges in order to make an earlier offense death eligible. But Appellant presents no "such evidence in this cáse. Moreover, prosecutors have “wide discretion over whether, how, and when to bring a case,” United States v. Segal, 495 F.3d 826, 833 (7th Cir. 2007) (internal quotation marks omitted), and Appellant’s argument is not strong enough to overcome our holding in Higgs that (c)(12) — and by extension (c)(2) and (c)(4) — encompasses all offenses for which the defendant has been convicted at .the time of sentencing, regardless of whether the offense or conviction occurred after the capital offense.
And as.-to whether (c)(2) and (c)(4) are unconstitutionally vague, Higgs again provides the answer. Examining the language and structure of the FDPA, we explained that “Congress did not specify that, either the prior offense or conviction had to occur before the death penalty offense.” Higgs, 353 F.3d at 318. Rather, “where Congress has intended a different practice in other circumstances, it has made that intent clear.” Id. (citing 21 U.S.C. § 841(b)(1)(C); 18 U.S.C. § 922(g)(1)). Holding at this juncture that (c)(2) and (c)(4) are unconstitutionally vague would fly in the face of this analysis and Higgs’s ultimate conclusion.[10]
iii. •

Fifth Amendment Claim

Finally, Appellant claims his sentence violates the Fifth Amendment because it fails to provide fair notice and violates double jeopardy guarantees. The Fifth Amendment, provides in relevant part, “No person shall be ... subject for the same offence to be twice put in jeopardy of life or limb; ... nor [shall he] be deprived of life, liberty, or property, without due process of law.” U.S. Const, amend. Y. The Due Process Clause prohibits the Government from “taking away someone’s life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement.” Beckles v. United States, _ U.S. _, 137 S.Ct. 886, 892, 197 L.Ed.2d 145 (2017).
These arguments also fail. Appellant cannot claim he' had no notice of potential consequences of his actions. Section 1111 of Title 18, which provides for a penalty of death for first-degree murder, did not change between Snell’s murder and Appellant’s sentencing, nor did (c)(2) and (c)(4). And the district court interpreted these provisions in a manner consistent with the Higgs decision, which was issued more than five years before Snell’s murder.
As .for double jeopardy, there are no such concerns here. The imposition of a death sentence was not above the author *313 ized statutory maximum punishment, and any implication that the Arlington crimes “bec[a]me[ ] a tail which wags the dog of the substantive offense” bears on the issue of prosecutorial misconduct, which was not raised below or in this appeal. Appellant’s Br. 33 (quoting Witte v. United States, 515 U.S. 389, 403, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995)).
B.

Whether the Arlington Crimes Satisfy § 3592(c)(2) and (c)(4)

We next address Appellant’s argument that the Arlington crimes do not qualify as previous convictions under 18 U.S.C. § 3592(c)(2) and (c)(4). This argument has two parts: first, whether the district court should have applied the categorical approach in the eligibility phase; and second, whether the Arlington crimes satisfy the elements of (c)(2) and (c)(4). We review these issues de novo. See United States v. Ritchie, 858 F.3d 201, 209 (4th Cir. 2017). Because only one statutory ag-gravator is necessary to render Appellant death eligible, we will focus on (c)(2), which again provides: “the defendant has previously been convicted of a Federal or State offense punishable by a term of imprisonment of more than 1 year, involving the use or attempted or threatened use of a firearm (as defined in [18 U.S.C. § 921]) against another person.”
1.

Categorical Approach

Appellant argues that Congress contemplated application of the categorical approach to § 3592(c)(2) and (c)(4) when it enacted the FDPA. Appellant’s, argument, however, contravenes the language and purpose of the FDPA, and, once again, is in tension with Higgs.
a.
The categorical approach was first announced in Taylor v. United States, 495 U.S. 575, 599-602, 110 S.Ct. 2143, 109 L.Ed.2d 607 (1990). There, the Court held that 18 U.S.C. § 924(e)(2)(B)(ii) — which provided a sentencing enhancement for a person who “has three previous convictions” for a “violent felon/’ offense,, in that case, “burglary” — “generally requires the trial court to look only to the fact of conviction and the statutory definition of the prior offense.” Taylor, 495 U.S. at 600-02, 110 S.Ct. 2143 (footnote omitted).
■ Determining whether to apply the categorical- approach requires an exercise in statutory interpretation. See Ritchie, 858 F.3d at 209. We must decide whether the provision at issue refers “to an element of a ... statute,” in which case we use the categorical approach, or “to -the factual circumstances surrounding commission of the crime on a specific occasion,” in which we use the circumstance-specific approach. Nijhawan v. Holder, 557 U.S. 29, 33, 129 S.Ct. 2294, 174 L.Ed.2d 22 (2009). However, the “interpretive difficulty” is that “in ordinary speech words such as ‘criine,’ ‘felony,’ ‘offense,’ .and the like sometimes refer to a generic crime, ... and sometimes refer to the. specific acts in which an offender engaged on .a specific occasion,” Id. at 33-34, 129 S.Ct. 2294.
Higgs addressed the question of whether courts must apply the categorical approach in determining whether, a prior conviction involved the use of a firearm under § 3592(c)(2), meaning the court would “only look to the fact of conviction and the statutory definition of the crime of- conviction to determine whether, a firearm was involved, not to the particular facts of the case.” Higgs, 353 F.3d at 316 (citing Taylor, 495 U.S. at. 588-89, 110 S.Ct. 2143). Because use of a firearm is not a specific element of the Maryland offenses for *314 which Higgs was convicted, and because he did not specifically admit the use of a firearm, Higgs claimed they should not qualify. See id.
We rejected this argument for two reasons. First, we explained that because the language of § 3592(c)(2) “quite plainly requires only that the previous conviction Hnvolv[e] the use or attempted or threatened use of a firearm,’ it authorizes and likely requires the court to look past the elements of the offense to the offense conduct.” Higgs, 353 F.3d at 316 (emphasis supplied). Second, we observed that while the Supreme Court in Taylor “noted that the categorical approach was proper to avoid ‘the practical difficulties and potential unfairness of a factual approach,’ the Court has made it clear that an individualized determination is required in the death penalty context.” Id. at 317 (citations omitted) (emphasis in original) (quoting Taylor, 495 U.S. at 601, 110 S.Ct. 2143).
Since Higgs, the Eighth Circuit has concluded the categorical approach should not apply, this time to § 3592(c)(4). See United States v. Rodriguez, 581 F.3d 775, 805-07 (8th Cir. 2009). Rodriguez noted that the district court in that case agreed with Higgs that the word “involving” “suggests fact-finding beyond” the categorical approach. Id. at 805. But it recognized that other courts apply the categorical approach to criminal statutes containing the word “involves,” ultimately concluding, “[T]he meaning of ‘involv[es]’ does not resolve the issue.” Id. at 806 (comparing United States v. McCall, 439 F.3d 967, 970 (8th Cir. 2006) (en banc) (applying categorical approach to the residual clause in § 924(e)(2)(B)(ii)): “otherwise involves conduct that presents a serious potential risk of physical injury to another”), overruled by Begay v. United States, 553 U.S. 137, 128 S.Ct. 1581, 170 L.Ed.2d 490 (2008), with Nijhawan, 557 U.S. at 32, 129 S.Ct. 2294 (declining to apply the categorical approach to statute reaching a conviction that “involves fraud or deceit in which the loss to the victim or victims exceeds $10,000” (quoting 8 U.S.C. § 1101(a)(43)(M)(i)) (emphasis supplied)).
Rather than relying on the term “involving,” the court turned to examine the structure and language of § 3592(c)(4) and the FDPA. See Rodriguez, 581 F.3d at 806. First, Rodriguez acknowledged that, unlike sentencing enhancements under the Armed Career Criminal Act (“ACCA”), 18 U.S.C. § 924(e), pursuant to which courts routinely employ the categorical approach, when a § 3592(c) statutory aggravator is proven under the FPDA, a death sentence does not automatically result; the defendant is rather deemed eligible for a death sentence. See 581 F.3d at 806. The jury still must weigh any aggravating factors against mitigating factors, an individualized balancing that the ACCA does not contemplate. See id.
Next, the FDPA “mandates a fact-intensive process in death-eligible proceedings.” Rodriguez, 581 F.3d at 806. At the penalty phase, the FDPA allows for the introduction of oral testimony, evidence of the effect of the offense on the victim and the victim’s family, and a victim impact statement identifying evidence of the extent and scope of injury and loss. See id. But factual inquiry is not permitted under the ACCA. See Taylor, 495 U.S. at 601, 110 S.Ct. 2143 (noting that, under the ACCA, “the practical difficulties and potential unfairness of a factual approach are daunting”). Indeed, unlike the ACCA context, during the penalty phase of an FDPA matter, a Presentence Report is not prepared, but rather, “information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted dr required to be considered under section 3592.” Rodriguez, 581 *315 F.3d at 806 (quoting § 3593(c)). Moreover, “Taylor prohibits relying on witness testimony in ACCA cases; the FDPA expressly permits witnesses to testify.” Id. at 807. Based on these reasons, the Eighth Circuit joined this court in rejecting the categorical approach to an FDPA prior conviction aggravator. See id. n.13 (noting its decision comports with Higgs).
Some district courts have followed Rodriguez’s reasoning and have held that the categorical approach is inappropriate as applied to § 3592(c)(2). See, e.g., United States v. Con-ui, No. 3:13-cr-123, 2017 WL 783437, at *11-12 (M.D. Pa. Mar. 1, 2017) (allowing the circumstance-specific approach because “[t]he objective of the sentencing stage of a capital case is to allow the jury a full appraisal of the defendant,” and “the jury should receive ‘as much information as possible when it makes the sentencing decision’ ” (quoting United States v. Lujan, 603 F.3d 850, 858 (10th Cir. 2010); Gregg v. Georgia, 428 U.S. 153, 203-04, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976))); United States v. Basciano, 763 F.Supp.2d 303, 348 (E.D.N.Y. 2011) (finding Rodriguez to be “well reasoned, ... persuasive, and [to] appl[y] equally to § 3592(c)(2)”), aff'd on other issues, 634 Fed.Appx. 832 (2d Cir. 2015); United States v. Anh The Duong, No. CR-01-20154, 2010 WL 275058, at *3 (N.D. Cal. Jan. 14, 2010) (“This Court agrees with the Eighth Circuit's analysis in Rodriguez, which comports with the Fourth Circuit’s in Higgs.” (internal quotation marks omitted)). One district court held likewise before Rodriguez or Higgs. See United States v. Chong, 98 F.Supp.2d 1110, 1121 (D. Haw. 1999) (noting that the FDPA provides for “the introduction of ‘any’ relevant information in support of aggravating factors,” and the Supreme Court “mandate[s] particularize^] capital sentencing proceedings”).
Our research has turned up a single decision holding that the categorical approach should apply to prior conviction aggravators in the eligibility phase. See United States v. Smith, 630 F.Supp.2d 713, 717 (E.D. La. 2007). Smith emphasized the distinction between the eligibility and selection phases of the penalty phase: “Statutory aggravating factors are relevant to the eligibility phase of capital sentencing, which is to narrow the pool of offenders eligible for death. It is at the selection phase that the individualization of the sentencing occurs, likewise the weighing of the aggravating and mitigating circumstances to determine whether a death sentence should in fact be imposed.” Id. (emphases in original). And “the issue of individualized sentencing is simply not at play in the eligibility phase of a capital sentencing.” Id. at 718.[11]
b.
Smith notwithstanding, we find the reasoning of the majority view to be most persuasive.
The categorical approach was born out of the ACCA, and the Supreme Court has *316 gone to great lengths to reiterate the nonfactual, element-based nature of ACCA enhancements. Last year in Mathis v. United States, the Court' explained that in ACCA cases,
a sentencing judge may look only to the eleinents of the offense, not to the facts of the defendant’s conduct.
That simple point became a mantra in our .... ACCA decisions. At the risk of repetition (perhaps downright tedium), here are some examples. In Shepard [v. United States]: ACCA “refers to predicate offenses in terms not of prior conduct but of prior ‘convictions’ and the ‘element[s]’ of crimes.” 544 U.S. [13,] 19 [125 S.Ct. 1254, 161 L.Ed.2d 205] [ (2005) ] (alteration in original). In James v. United States: “[W]e have avoided any inquiry into the underlying facts.of [the defendant’s] particular offense, and have looked solely to the elements of [burglary] as defined by [state] law.” 550 U.S. 192, 214 [127 S.Ct. 1586, 167 L.Ed.2d 532] (2007). In Sykes v. United States: “[W]e consider [only] the elements of the offense[,] without inquiring into the specific conduct of this particular offender.” 564 U.S. 1, 7 [131 S.Ct. 2267, 180 L.Ed.2d 60] (2011) (quoting James, 550 U.S. at 202 [127 S.Ct. 1586]; emphasis in original). And most recently (and tersely) in Descamps [v. United States]: “The key [under ACCA] is elements, not facts.” [_ U.S. _] 133 S.Ct. [2276], 2283 [186 L.Ed.2d 438] [ (2013) ].
_ U.S. _, 136 S.Ct. 2243, 2251-52, 195 L.Ed.2d 604 (2016) (some alterations, citations, and internal quotation marks omitted). Mathis gave three reasons why an element-only, categorical inquiry is favorable in the ACCA context: (1) the text favors that approach; (2) a'judge cannot constitutionally go beyond identifying the crime of conviction and what elements that crime required; and (3) an elements focus avoids unfairness to the defendant. See id. at 2252. We find none of these reasons applicable to the FDPA context.
i.
First, while Descamps states that when it comes to the ACCA, “the key is elements, not facts,” the FDPA stands for the converse: the key is facts, not elements. See Caro, 597 F.3d at 626 (4th Cir. 2010) (“[T]he decision whether- to select the death penalty should involve ‘an individualized determination on the basis of the character of the individual and the circumstances of the crime.’ ” (quoting Zant, 462 U.S. at 879, 103 S.Ct. 2733)). For example, the FDPA requires the following procedures aimed at a specific, individualized, fact-based conclusion:
• The FDPA mandates “a separate sentencing hearing to determine the punishment to be imposed.” 18 U.S.C. § 3593(b).-
• At the hearing, no presentence report is prepared; instead, “information may be presented as to any matter relevant to the sentence,” which includes both aggravating and mitigating factors “required to be considered.” Id. § 3593(c).
• The Government may present “any information relevant to an aggravating factor.” Id. § 3593(c).
• (‘Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury,” Id.
•' “The burden of establishing the exis- . tence of any aggravating factor is on the government, and -is not satisfied *317 unless the existence of such a factor is established beyond a reasonable doubt.” Id.
• “The jury ... shall consider all the information received during the hearing [and] shall return special findings identifying any aggravating factor or factors set forth in [§ 3592] found to exist....” Id. % 3593(d).
It is obvious Congress’s intent was that information relevant to the particular defendant and his or her particular sentence is fair game in the entirety of the sentencing hearing. Applying the categorical approach, even to one phase of that hearing, flouts this intent.
On this point, Appellant attempts to liken the text of (c)(2) to the type of language Taylor held to invoke the categorical approach. But Taylor itself distinguished a definition of violent felony that contained the phrase “has as an element,” which refers to the elements of statute, from one using the word “involves,” which likely refers to “the facts of each defendant’s conduct.” 495 U.S. at 600-01, 110 S.Ct. 2143. Thus, when the FDPA was enacted in 1994, the use of the word “involv[es]” was actually a signal that a fact-based approach was warranted. We have very recently held, in fact, that a provision of the Mandatory Victims Restitution Act referring to “an offense ... that is A. an offense against property under [Title 18]” did not warrant the categorical approach because it “contain[ed] no language suggesting that courts look only to the elements of Title 18 statutory offenses.'”’ See Ritchie, 858 F.3d at 210 (quoting Nijhawan, 557 U.S. at 37, 129 S.Ct. 2294). We likewise find no indication in (c)(2) that courts should look only to the elements of a state conviction involving the use of a firearm.
Moreover, under Appellant’s reading of § 3592(c)(2), the phrase “involving the use or attempted or threatened use of a firearm” would carry different meanings throughout the penalty phase, which would prove unwieldy. See Ritchie, 858 F.3d at 210 (We must “account for practical considerations when determining whether to employ the categorical or circumstance-specific approach.” (internal quotation marks omitted)). In Appellant’s view, -the court would first decide (for example) whether Appellant’s Virginia conviction for use of a firearm in a felony categorically “involv[ed] the use or attempted or threatened use of a firearm.” § 3592(c)(2). Assuming, arguendo, the court ruled the crime categorically involved the use of a firearm, the conviction would be submitted to the jury, which would consider whether the crime actually involved the use of a firearm and weigh the circumstances of that crime against mitigating evidence, all of which would require fact-based determinations.
ii.
Second, unless the defendant directs otherwise, the sentencing hearing must be conducted before a jury; therefore, disallowing a judge’s legal determination at the outset of the eligibility phase skirts any potential Sixth Amendment problem contemplated by Mathis. See § 3593(b)(1)-(3). Indeed, in the FDPA context, the jury is specifically required to “determine which [aggravating factors], if any, exist.” § 3592(c); see also § 3593(d) (“The jury ... shall return special findings identifying any aggravating factor ... set forth in [§ 3692] found to exist.” (emphasis supplied)). If “an aggravating factor required to be considered under § 3592(c) is found to exist,", only then shall “the jury ... consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist justify a sentence of death.” *318 § 3593(e). Thus, Congress intended that the jury not only do the weighing process, but also initially find which statutory aggravating factors apply to a particular defendant’s sentence. If the court decided a prior conviction did not categorically involve the use of a firearm (if, as Appellant contends and the dissent posits, the Virginia definition of firearm is broader than the federal definition), the statutorily mandated function of the jury is completely usurped.[12]
iii.
Our dissenting colleague believes employing the categorical approach would result in a fairer sentencing process, noting the gravity and seriousness of a death sentence. See post at 333-34. He admits that his approach “may render certain defendants who would otherwise be death eligible no longer able to be considered for capital punishment.” Id. at 338. In our view, however, any perceived fairness conferred to a defendant by use of the categorical approach in the FDPA context must be weighed against Congress’s obvious intent, careful delineation of the stages of death penalty sentencing, and the overall purpose of the FDPA.
Appellant and our dissenting colleague believe we should view the eligibility and selection phases in separate vacuums: although they recognize the FDPA’s emphasis on an individualized sentence, they attempt to confine that emphasis to the selection phase only. But the idea that an individualized analysis has no place in the eligibility phase is neither present in, nor contemplated by, the FDPA. For starters, the FDPA does not mandate trifurcated proceedings, meaning that courts are not required to separate the eligibility and selection inquiries into two separate hearings. In fact, we have held the Constitution does not require trifurcation. See Booth-El v. Nuth, 288 F.3d 571, 582-83 (4th Cir. 2002) (rejecting argument that denial of request for trifurcation violates due process); see also United States v. Fell, 531 F.3d 197, 240 (2d Cir. 2008).
And holding that the categorical approach should apply in this case, but not a case with a bifurcated proceeding, like Higgs, could have untoward (and ultimately unfair) consequences. Generally, instead of requiring the Government consent to trifurcation, courts have followed normal motion practice procedure, taking each side’s arguments in turn. There are many reasons a defendant would desire trifurcation and an eligibility hearing first; for example, in the case at hand, evidence of the Zion crimes only came in at the selection phase, decreasing the potential for prejudice in the eligibility phase. But holding that the categorical approach should apply as a matter of law in the eligibility phase would surely discourage any zealous prosecutor from consenting to a trifurcat-ed proceeding. See, e.g., United States v. Bolden, 545 F.3d 609, 618-19 (8th Cir. 2008); United States v. Johnson, 362 F.Supp.2d 1043, 1099 (N.D. Iowa 2005), aff'd in part, 495 F.3d 951 (8th Cir. 2007) (noting defendant’s motion for trifurcation “became one of the most contentious” motions before the court).
Finally, we cannot ignore the Supreme Court’s admonition that the statutory ag-gravators “must genuinely narrow the class of persons eligible for the death pen *319 alty.” Zant, 462 U.S. at 877, 103 S.Ct. 2733 (emphasis supplied). The dissent is correct that its approach would narrow the class of persons eligible for the death penalty, but any such narrowing must also be genuine — that is, it must be done in an “objective, evenhanded, and substantively rational way.” Caro, 597 F.3d at 623 (quoting Zant, 462 U.S. at 879, 103 S.Ct. 2733).
The death penalty is reserved “for the most culpable defendants committing the most serious offenses,” Miller v. Alabama, 567 U.S. 460, 132 S.Ct. 2455, 2467, 183 L.Ed.2d 407 (2012), but under the categorical approach, the judge would “presume” that the prior conviction “rested upon nothing more than the least of the acts criminalized” under the criminal statute at issue, Mellouli v. Lynch, _ U.S. _, 135 S.Ct. 1980, 1986, 192 L.Ed.2d 60 (2015) (quoting Moncrieffe v. Holder, 569 U.S. 184, 133 S.Ct. 1678, 1684-85, 185 L.Ed.2d 727 (2013)); accord Esquivel-Quintana v. Sessions, _ U.S. _, 137 S.Ct. 1562, 1568, 198 L.Ed.2d 22 (2017). We fail to see how the categorical approach, which focuses on the least culpable act proscribed by statute rather than the particular culpability of a defendant, narrows in any genuine way the type of defendants who should be eligible for a death sentence.[13]
iv.
Finally, we address the Supreme Court’s decisions in James v. United States, 550 U.S. 192, 127 S.Ct. 1586, 167 L.Ed.2d 532 (2007), and Johnson v. United States, _ U.S. _ 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015), upon which our dissenting colleague relies. The James Court applied the categorical approach to the ACCA’s now-defunct residual clause, which provided a sentencing enhancement for a prior conviction that “involves conduct that presents a serious potential risk of physical injury to another.” See 550 U.S. at 201-02, 127 S.Ct. 1586 (quoting 18 U.S.C. § 924(e)(2)(B)(ii)). Appellant suggests and the dissent proclaims that James, and the Court’s subsequent reaffirmation and explanation of the categorical approach in Johnson, implicitly overruled Higgs’s holding on the categorical approach issue. See post at 325-26; see also Appellant’s Br. 59-60.
It is true that Higgs relied on the term “involv[e]” to demonstrate that a fact-specific inquiry was warranted, while James held that crimes defined by types of conduct “involved,” especially within the ACCA, are susceptible to the categorical approach. See James, 550 U.S. at 202, 127 S.Ct. 1586 (noting that the Court had taken the categorical approach “with respect to other offenses under ACCA”). But we are not convinced that James overruled Higgs on this point. To begin, the Higgs court was careful to state that the use of the word “involving” “authorizes and likely *320 requires the court to look past the elements of the offense.”. 353 F.3d at 316 (emphasis supplied). Higgs in no way held that any. statute using the word “involving” precluded the categorical approach, and James in no way held, that any statute containing that word required the categorical approach. For example, elsewhere in § 3592(c), Congress uses the word “involved” in the context of a plainly non-categorical statutory aggravators. See, e.g., § 3592(c)(6) (“The defendant committed the offense in an especially heinous, cruel, or depraved, manner in that it involved torture or serious physical abuse to the victim.” (emphasis supplied)); § 3592(c)(13) (“The .defendant committed the offense in the course of engaging in a continuing criminal enterprise in violation of [21 U.S.C. ’ § 848(c) ], and that violation involved the distribution of drugs to persons under the age of 21” (emphasis supplied)). In other words, the word “involves” can still “authorize[ ]” courts to look past the elements of the offense. Therefore, Higgs and James can coexist.[14]
As for Johnson, that decision stated, “Taylor explained that the relevant part of the [ACCA] refers to ‘a person who ... has three previous convictions’ for — not a person who has committed — three previous violent felonies or drug offenses,” and “[t]h[e] emphasis on convictions indicates that Congress intended the sentencing court to look only to the fact that the defendant had been convicted of crimes falling within certain categories, and not to the facts underlying the prior convictions.” 135 S.Ct. at 2562 (citations and internal quotation marks omitted). Although § 3592(c)(2) is written in terms of a person “ha[ving] previously been convicted of’ a certain crime, rather than a person “who has committed” a certain crime, Johnson’s analysis was specifically couched in terms of' the ACCA, and as discussed above, there are ample reasons the categorical approach is suitable to the ACCA and not the FDPA. Therefore, we cannot say Johnson has overruled Higgs either.
In any event, our analysis does not rise and ‘fall on the Higgs decision. As the Eighth Circuit stated, the meaning of “involving” simply “does riot resolve the issue.” Rodriguez, 581 F.3d at 806. We find the réasoning of Rodriguez, its progeny,. Mathis, and the language of the FDPA itself most persuasive and supportive of Higgs’s ultimate resolution on this- point. Therefore, we conclude the categorical approach does not apply to § 3592(c)(2).
2.

Application

Having decided the categorical approach does not apply, we conclude that the Arlington crimes clearly qualify as pri- or convictions of violent felonies involving a firearm pursuant to § 3592(c)(2). For the events occurring on February 27, 2010, Appellant was convicted of, inter alia, use of a firearm in a felony, and breaking and entering while armed. Any challenge Appellant brings regarding whether these convictions “involved] the use or attempted or threatened use of a firearm ... against another person” is basically a sufficiency challenge that must fail. § 3592(c)(2).
Both J.T, and K.M. testified that Appellant had a firearm, and we' have held, “Eyewitness testimony is sufficient to prove that a person used a firearm.” Unit *321 ed States v. Redd, 161 F.3d 793, 797 (4th Cir. 1998). The Government need not “present expert testimony” that a defendant’s putative firearm was “capable of expelling a projectile ,.. absent some indication that the firearm was a fake.” U.S. v. McNeal, 818 F.3d 141, 149 (4th Cir. 2016) (citing United States v. Jones, 907 F.2d 456, 460 (4th Cir. 1990)). “[L]ay testimony of eyewitnesses that a gun was used in [an offense] is a sufficient basis for the jury to find that a ‘firearm’ was used” during the offense. Id. (internal quotation marks omitted). The evidence showed that Appellant owned a Glock 22, and that his Glock was designed to expel a projectile using an explosive, see id. at 4437 (testimony of Officer Keith Ahn), satisfying the federal definition of a firearm. See 18 U.S.C. § 921(a)(3)(A). And it is without question that Appellant attempted or threatened to use the firearm on both J.T. and M.N. by showing them the gun and forcing them to perform certain acts. Therefore, Appellant’s convictions regarding the February 27 conduct satisfy § 3592(c)(2), making Appellant death eligible.
C.

Competency Evaluation

Appellant also contends that the district court erred by allowing him to forego challenges to the Government’s eligibility and selection phase evidence and allowing him to waive a mitigation defense without “first determining his competency to make those decisions.” Appellant’s Br. 112. We review a court’s failure to conduct a competency hearing or evaluation for abuse of discretion. See United States v. Mason, 52 F.3d 1286, 1289 (4th Cir. 1995). We “may not substitute [our] judgment for that of the district court; rather, we must determine whether the court’s exercise of discretion, considering the law and the facts, was arbitrary or capricious.” Id.
During-the course of the pre-trial proceedings, Appellant persistently urged the court to allow him' to represent himself, citing disputes with counsel. In early 2013, the district court sua sponte ordered a ■competency evaluation, the1 results of which were outlined in a letter to the district court on February- 19, 2013, approximately one year before trial began.
Psychiatrist Richard Ratner conducted the evaluation, which was comprised of a three hour jail interview with Appellant and lengthy discussions with three attorneys who knew or had worked with Appellant. Dr. Ratner did not conduct an extensive evaluation of Appellant’s previous psychiatric history or his developmental, family, social, educational, occupational, legal, and substance use history. Dr. Rat-nér’s letter mentions that Appellant had been examined by two other mental health professionals, but he neither requested nor had access to the results of that' testing. Nonetheless, Dr. Ratner concluded that Appellant did not suffer from a diagnosable mental illness, was fully competent to stand trial, and had the requisite mental and psychological capacity to represent himself.
Notably, Dr. Rainer’s letter explained that Appellant had a strong aversion to discussing his personal history and a strong opposition to pursuing a mitigation defense. He questioned Appellant’s judgment on these points, but explained that his choices should not have as significant an effect on the guilt phase. He noted, however, that if a question of competency was raised at the penalty phase, the court could deal with that issue at a later time.
Three days after the competency evaluation letter was written, the district court held a hearing in which Appellant himself stated it was probably “not in my best interests [sic] to represent myself.” Appel- *322 lee’s Br. 95 (quoting sealed J.A.). The district court, after hearing from counsel and reviewing Dr. Ratner’s letter, determined Appellant was competent to stand trial and granted a request for substitute counsel, who represented Appellant throughout the guilt phase.
After Appellant was found guilty, he again clashed with counsel over whether to present mitigation evidence in the penalty phase. The district court held an ex parte hearing and asked defense counsel, “Have you seen a change in the mental health of Mr. Torrez over the last year?” Counsel responded that he and his co-counsel were “unable to file an affidavit that says [Appellant] is not competent.” J.A. 4400-01. The district court also stated that it had “checked with the Alexandria Detention Center to see whether there were any kind of incidents or any notes regarding a change in [Appellant’s] mental health, and they could not identify any.” Id. at 4401. The court then directed counsel to outline the mitigation case it would present, questioned Appellant at length, and ultimately found Appellant to be competent and allowed him to go forward with standby counsel present at the penalty phase.
Appellant now contends that the district court should have ordered a second competency evaluation and hearing before allowing Appellant to proceed to sentencing with only standby counsel and before he made the choice to present no mitigation evidence whatsoever.
At any time prior to sentencing a defendant, the district court “shall order [a competency] hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him.” 18 U.S.C. § 4241(a); see also United States v. Moussaoui, 591 F.3d 263, 291 (4th Cir. 2010). The well-established test for competence is whether the defendant “has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' — and whether he has a rational as well as factual understanding of the proceedings against him.” Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam) (internal quotation marks omitted). “To prevail, the defendant must establish that the trial court ignored facts raising a bona fide doubt” regarding competency. Walton v. Angelone, 321 F.3d 442, 459 (4th Cir. 2003) (internal quotation marks omitted).
Appellant contends that the district court was presented with several facts that mandated a court-ordered competency evaluation and hearing: defense counsel’s alleged “somewhat equivocal opinion” that Appellant was competent, Appellant’s Br. 114; defense counsel’s view that Appellant’s decision to forego a mitigation defense was irrational; the 2013 competency evaluation applied only to the guilt phase, and Appellant’s mental state in 2014 was “exacerbated by the stress of a capital trial,” id.\ the Government recommended another competency evaluation in the event of an appellate waiver; and there were “red flags” that Appellant was not competent, id. at 116.
We have reviewed these circumstances and conclude the district court did not abuse its discretion in failing to order a second evaluation and hearing. Defense counsel’s opinion about Appellant’s competency was unequivocal, and we have recognized a defendant can make a “rational choice” to forego a mitigation defense. Chandler v. Greene, 1998 WL 279344, at *8 (4th Cir. May 20, 1998) (quoting Rees v. Peyton, 384 U.S. 312, 314, 86 S.Ct. 1505, 16 L.Ed.2d 583 (1966) (per curiam)). We also *323 reject the notion that a defendant’s desire to “fight the case” at the guilt stage makes per se irrational his decision to forego a mitigation defense at the penalty phase, once he has in fact been convicted. J.A. 4398. In addition, although the 2013 competency evaluation was conducted for purposes of the guilt phase, Dr. Ratner nonetheless mentioned Appellant’s desire that his counsel withhold investigation of mitigation evidence, and explained that while it “may” lead to a question of competency at the penalty phase, it was not a “manifestation of a diagnosable mental illness.” Ap-pellee’s Br. 95 (quoting sealed J.A.).
In addition, the Government’s request for a second competency evaluation came in its Position on Sentencing, and was made in the distinct context of a potential appellate waiver. Indeed, in that filing, the Government acknowledged, “[N]o ... showing [of a mental disease or defect] has been made with respect to the defendant.” J.A. 5246 n.l. Finally, the “red flags” mentioned by Appellant were either present before the 2013 evaluation, mentioned in the context of a wholly different issue in the case, or wholly non-probative of Appellant’s mental state. Therefore, Appellant has failed to demonstrate that the district court “ignored facts raising a bona fide doubt” regarding his competency, and we reject his arguments on this point, Walton, 321 F.3d at 459 (internal quotation marks omitted).
D.

Other Sentencing Arguments

We have reviewed Appellant’s remaining sentencing arguments: whether Appellant’s Fifth Amendment rights were violated when the Government submitted and failed to correct allegedly false or misleading evidence in the eligibility phase; aside from the competency issue discussed above, whether the district court otherwise erred in allowing Appellant to waive his right to contest or rebut the Government’s case in the eligibility and selection phases of the sentencing trial; and whether the Eighth Amendment barred the admission of evidence of the Zion' murders in the selection stage. We find each of these arguments to be without merit.
V.

Conclusion

For the foregoing reasons, we find no reversible error as to the issues raised by Appellant. We are also satisfied that (1) the evidence clearly “supports the special finding of the existence of an aggravating factor required to be considered under section 3592,” and (2) the sentence of death was not “imposed under the influence of passion, prejudice, or any other arbitrary factor.” 18 U.S.C. § 3595(c)(1). Accordingly, we affirm Appellant’s conviction and death sentence.

AFFIRMED

. Citations to the "J.A." refer to the Joint Appendix filed by the parlies in this appeal.

. Two Arlington County police officers had observed someone matching Appellant’s description and driving a Dodge Durango stalking women from his car for long periods of time from February 4 through 6, days before the first Arlington crime.

. Appellant was eventually indicted for the • Zion murders in Illinois before the sentencing hearing in this case.

. Appellant also confided to El-Atari about the murders of Laura Hobbs and Krystal To-bias. He told him he killed two girls when he was 16 years old, and when the father of one of the girls confessed, "I was like, Damn.... I’m clean. I’m good. I ain’t got shit to worry about.” J.A. 5081. Appellant recounted the murders in excruciating detail, and his story corresponded with the autopsies of the girls. But again, he changed his story about his motive. See, e.g., id. at 5092 (stating it was ''[r]andom”); id. at 5115 (stating he did it for “no reason”); id. at 5140 (suggesting the girls saw him deliver drugs). He also claimed he did not have sexual contact with either one of them.

. Appellant acknowledges that his CSLI argument is foreclosed by this court’s en banc decision in United States v. Graham, 824 F.3d 421, 423 (4th Cir. 2016) (en banc). See Appellant’s Reply Br. 85. Thus, we will not address it here.

. Although this is, for all intents and purposes, a challenge to Appellant’s sentence, see Appellant’s Br, 179 n.73, we address it here because the voir dire occurred at the outset of trial, and Appellant contends the jurors were not “qualified to serve in a capital case,” see id. at 178.

. By its plain language, the FDPA does' not require a trifurcated proceeding; rather, it requires, after the guilt phase, "a separate sentencing hearing” and thus a bifurcated proceeding at minimum. 18 U.S.C. § 3593(b), Courts addressing the issue, however, have held that this language does not preclude a bifurcated sentencing hearing resulting in an overall trifurcated proceeding, See United States v. Fell, 531 F.3d 197, 240 (2d Cir. 2008) (“the central point of that phrase[, 'a separate sentencing hearing,’] is that the sentencing decision should be separated from the guilt phase — not that the sentencing phase must necessarily take place during one uninterrupted hearing,”); accord United States v. Bolden, 545 F.3d 609, 618 (8th Cir. 2008).

. Subsections (c)(2) and (c)(4) require that the defendant "has previously been convicted," whereas (c)(12) requires he "had previously been convicted.”

. To be sure, Almendarez-Torres's holding has become "shak[ier]” in the years since Higgs. See Alleyne v. United States, _ U.S. _, 133 S.Ct. 2151, 2160 & n.1, 186 L.Ed.2d 314 (2013) (holding that the Sixth 'Amendment provides defendants with the right to a jury determination of facts increasing the statutory minimum sentence, but declining to revisit Almendarez-Torres, because the “parties d[id] not contest that decision’s vitality”); United States v. McDowell, 745 F.3d 115, 124 (4th Cir. 2014) ("[T]he Supreme Court's recent characterizations of the Sixth Amendment are difficult, if not impossible, to reconcile with Almendarez-Torres’s lonely exception to Sixth Amendment protections.” (citing Alleyne, 133 S.Ct. at 2160)); see also Shepard v. United States, 544 U.S. 13, 28, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005) (Thomas, J., concurring) ("The parties do not request it here, but in an appropriate case, this Court should consider Almendarez-Torres’ continuing viability. Innumerable criminal defendants have been unconstitutionally sentenced under the flawed rule of Almendarez-Torres, despite the fundamental imperative that the Court maintain absolute fidelity to the protections of the indi-, vidual afforded by the notice, trial by jury, and beyond-a-reasonable-doubt require.ments.” (internal quotation marks omitted)).

. Although we recognize that we are constrained by Higgs on this issue, we nonetheless observe the merit of Appellant’s statutory argument. Unbound by Higgs, one could read the phrase ‘.‘has previously been convicted” in (c)(2) and (c)(4) as ambiguous and invoke the rule of lenity. And notwithstanding the lingering viability of Almendarez-Torres, the rule of lenity need not apply only to elements of a conviction, but can also apply to sentencing factors. See United States v. Hall, 972 F.2d 67, 69 (4th Cir. 1992) ("Under the rule of lenity any criminal statute, including a sentencing provision, must be construed in favor of the accused and against the government if it is ambiguous.” (emphasis supplied)).

. Smith also distinguished Higgs, explaining that Smith was originally charged with an aggravated robbery conviction but pled guilty to a robbery conviction; that is, "[i]n effect, he pled out from the alleged use of a firearm.” Id. at 717, In Higgs, however, Higgs "admitted as part of the guilty plea colloquy” that he used a firearm, telling the court at the plea colloquy that the prosecutor accused him of using the wrong gun. See id. This led Smith to hold that, even apart from the propriety of the categorical approach, "allowing evidence of Smith’s use of a firearm to prove the statutory aggravating factor alleged, in light of Smith’s guilty plea to a lesser charge which did not have firearm use as an element nor as part of the factual basis of the plea, would be unfair, unduly prejudicial and confusing to the jury.” Id. at 718.

. The dissent observes that even if a judge determines a prior conviction involves the use of a firearm, a capital jury must still determine “whether the government has sufficiently proved that the prior convictions exist,” thus retaining some role, albeit perhaps a "perfunctoiy” one. Post at 332 & n.6. Under the dissent’s view, however, the capital jury’s role in the eligibility phase is reduced to superficiality, and we fail to see how this satisfies the "jury’s prescribed function” as set forth in § 3592(c) and § 3593(d). Post at 333.

. We take issue with the dissent's suggestions that it is “bizarre,” “especially strange,” and somehow "twists death penalty jurisprudence” to hold both (1) that permitting post-offense convictions to qualify as previous convictions can "narrow the class of all murderers to only murderers with previous convictions,” and (2) that the categorical approach does not "genuinely narrow" the class of persons eligible for the death penalty. Post at 333-34. Believing the former certainly does not preclude believing the latter. Higgs has already decided that using post-offense convictions genuinely narrows the class of murderers to those murderers who received a qualifying conviction before sentencing. See Higgs, 353 F.3d at 318 (suggesting prior conviction aggravators “do[] not concern matters directly related to the death penalty offense [but] [r]ather [are] concerned with the characteristics of the offender as of the time that he is sentenced”). But the categorical approach prohibits consideration of previous offenses as a “characteristic[ ]” of the defendant; rather, it places the defendant’s prior history in a generic vacuum. As such, it is not a "genuine” narrowing of murderers to death-eligible murderers;

. The dissent also states that the word involving "on its own" cannot signify that the categorical approach is inappropriate. Post at 326, But Higgs did not rely on that word alone; it also noted the "individualized determination" required in the death penalty context. See 353 F.3d at 317.